**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

|  |  |  |
|---|---|---|
| **STEVEN BROWN, *et al.*,** | : | |
| | : | |
| Plaintiffs, | : | Case No.: |
| | : | 1:22-cv-00080-TSK |
| **v.** | : | |
| | : | |
| **THE BUREAU OF ALCOHOL, TOBACCO,** | : | |
| **FIREARMS AND EXPLOSIVES, *et al.*,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

John H. Bryan
(WV Bar No. 10259)
JOHN H. BRYAN,
ATTORNEY AT LAW
411 Main Street P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

Adam Kraut
KRAUT AND KRAUT
P.O. Box 101
Westtown, PA 19395
(610) 696-8200
Adam@Krautlaw.com
*Admitted Pro Hac Vice*


*Counsel for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................2

   I.   Regulatory Background ..........................................................................................2

   II.   Factual and Procedural Background.......................................................................3

ARGUMENT.....................................................................................................................5

   I.   Standards of Review ..............................................................................................5

   II.   The Court Has Article III Jurisdiction .................................................................6

         a.   The Individual Plaintiffs Have Article III Standing ...........................6

         b.   The Organizational Plaintiff Has Article III Standing........................7

   III.   The Bruen Test.......................................................................................................9

   IV.   The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791 ..........................................................................................9

   V.   The Second Amendment Does Not Permit the Government to Prohibit 18-to-20-Year-Olds from Purchasing Handguns from Licensed Retailers .....................................12

   VI.   The Handgun Ban Cannot Be Justified by Reference to Historical Analogues ...............19

         a.   The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Other Adults...20

         b.   Defendants Citations to 19th Century Sources are Unavailing .............................22

CONCLUSION ................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................5

*Coleman v. State*, 32 Ala. 581 (1858) ....................................................................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................passim

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ................................................................15

*Furman v. Georgia*, 408 U.S. 238 (1972) ................................................................11

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ......................................................10

*Harvey v. CNN, Inc.,* 2022 U.S. App. LEXIS 24824 (4th Cir. 2022) ................................5

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ...............................................13, 18

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) ....................................................passim

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................................10

*Marsh v. Chambers*, 463 U.S. 783 (1983) ...............................................................11

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................1, 11

*Metro. Towers, LLC v. Duff*, 2022 U.S. Dist. LEXIS 100818 (2022) ..............................5

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ....................18, 21

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ..........................................................................3, 6, 8

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ..............................................................14

*New York State Rifle & Pistol Assn'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .....passim

*Nunn v. Georgia*, 1 Ga. 243 (1846) .......................................................................13

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671 (4th Cir.
   2020) .......................................................................................................................7

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ..................................15

*Perpich v. Dep't of Def.*, 496 U.S. 334 (1990) .........................................................15

*Reese v. ATF*, No. 6:20-cv-01438 (W.D. La. May 5, 2021) ...........................................7

*State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878) ..........................................................22

*Tex. Assoc. of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir.
   2021) .......................................................................................................................8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ............................14

*United States v. Miller*, 307 U.S. 174 (1939) ...............................................................20

*United States v. Watson*, 423 U.S. 411 (1976) ..............................................................10

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).
   6, 8

*Village of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252 (1977) ..........7

*Virginia v. Moore*, 553 U.S. 164 (2008) .......................................................................11

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .........................................14

**Statutes**

18 U.S.C. § 922(a)(1)(A) ...............................................................................................3

18 U.S.C. § 922(b)(1) ..................................................................................................1, 3

18 U.S.C. § 922(c)(1) .....................................................................................................3

**Other Authorities**

2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834) ..............................................16

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §
   1890 (1833) ...............................................................................................................13

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit
   Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U.L.J. 119
   (2018) .........................................................................................................................23

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young
   Adults*, 43 S. ILL. U. L.J. 495 (2019) .......................................................................17

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second
   Amendment*, 82 MICH. L. REV. 204 (1983) ..............................................................17

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the
   Critical Period for Historical Analogues is when the Second Amendment was
   Ratified in 1791, and not 1868*, (Oct. 1, 2022) .......................................................10

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS
   OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938)................................16

**Rules**

Fed. R. Civ. P. 12(b)(1) ..................................................................................................5

Fed. R. Civ. P. 12(b)(6) ..................................................................................................5

Fed. R. Civ. P. 56(a) .......................................................................................................5

**Treatises**

Thomas M. Cooley, *A Treatise on Constitutional Limitation* (6th ed. 1890) .............22

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE
    UNITED STATES OF AMERICA 267–68 (1880) ......................................................14, 19

**Regulations**

27 C.F.R. § 478.124(a) .................................................................................................3

27 C.F.R. § 478.124(f) .................................................................................................3

27 C.F.R. § 478.96(b) ..................................................................................................3

27 C.F.R. § 478.99(b)(1) .............................................................................................3

**Constitutional Provisions**

U.S. CONST. amend. XXVI ...........................................................................................13

U.S. CONST. art. I, § 2, cl. 2 .......................................................................................13

U.S. CONST. art. I, § 8, cl. 16 .....................................................................................15

## INTRODUCTION

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). The Individual Plaintiffs in this case are adults between the ages of 18 and 21. They may vote, enter contracts, and marry. They are eligible to serve in the military. And yet, under 18 U.S.C. §§ 922(b)(1) & (c)(1) and its implementing regulations (collectively "the Handgun Ban"), they are entirely excluded from the commercial market for handguns. This is so even though (a) at the time the Second Amendment was adopted, 18-year-old men were universally understood to be members of the militia not just allowed but generally *required* to possess firearms, and (b) the handguns 18-to-20-year-olds are prohibited from purchasing are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 628–29). Although the Government claims it has the power to prohibit the sale of firearms to people under the age of 21, such a practice is not longstanding nor rooted in this nation's history and tradition. Plaintiffs have a constitutional right to purchase handguns, and that "necessarily takes [this] policy choice[] off the table." *Heller*, 554 U.S. at 636.

Following *New York State Rifle & Pistol Assn'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131, 2133 (2022) if a law restricts conduct falling within the scope of the Second Amendment's text, as the Handgun Ban does, that law is presumed invalid

1

and can only be saved if the Defendants demonstrate the existence of "a distinctly similar historical regulation" that burdened the right to bear arms in the same way and for the same reasons. That task is an impossible one. At the time the Second Amendment was ratified, not only were there *no laws in any state* that purported to limit the rights of 18-to-20-year-olds to purchase handguns for self-defense, there were several laws enacted, including the Militia Act of 1792, that *required* 18-year-olds to buy and maintain firearms. Even at the time that the Fourteenth Amendment was ratified only *two* states had a ban like the Handgun Ban and it would be another five years before another state adopted such a law. Defendants will not be able to point to any historical tradition that could justify the federal government's attempt to deviate from the plain text of the Second Amendment, therefore this Court must declare the Handgun Ban unconstitutional.

## BACKGROUND

### I.   Regulatory Background

Plaintiffs challenge the constitutionality of statutes that were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968 ("Act"), Pub. L. No. 90-351, 82 Stat. 197, along with regulations promulgated to enforce those statutory provisions, that together bar 18-to- 20-year-olds from purchasing handguns from federal firearms licensees ("FFLs"). In particular, the Act makes it unlawful for an FFL:

> to sell or deliver . . . any firearm or ammunition . . . if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a

2

> shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1). Likewise, the Act prohibits FFLs from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age." *Id.* § 922(c)(1). These statutes are implemented by regulations that similarly restrict handgun sales to individuals over 21. *See* 27 C.F.R. §§ 478.99(b)(1), 478.96(b), & 478.124(a), (f).

As a result of these statutes and regulations, "18-to-20-year-olds may not purchase handguns from FFLs." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA I*"), 700 F.3d 185, 190 (5th Cir. 2012). And FFLs effectively *are* the market for handguns—all who "engage in the business of importing, manufacturing, or dealing in firearms" must become FFLs. *See* 18 U.S.C. § 922(a)(1)(A). The Handgun Ban therefore shuts 18-to-20- year-olds out of the entire regulated market for handguns.

## II.  Factual and Procedural Background

Plaintiffs Steven Brown and Benjamin Weekley (collectively, "Individual Plaintiffs") are residents of West Virginia who are older than 18 but younger than 21 years old. First Am. Compl. Doc. 11 ¶¶ 7-8 (September 27, 2022) ("FAC"); Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("SOMF") ¶ 1,4, Brown Decl. ¶1, 3-4; Weekley Decl. ¶1, 3-4.

Each of the Individual Plaintiffs "has never been charged with nor convicted of any misdemeanor or felony offense, and is otherwise eligible to purchase and possess firearms, including handguns, under all applicable laws." FAC ¶¶ 18, 25; SOMF ¶ 1,4; Brown Decl. ¶ 3; Weekley Decl. ¶ 3. Neither owns a handgun but both intend and desire to purchase one, along with handgun ammunition, for lawful purposes, including self-defense. FAC ¶¶ 18, 25; SOMF ¶ 3, 6; Brown Decl. ¶ 11; Weekley Decl. ¶ 10. However, the Handgun Ban prevents each of them "from purchasing handguns from federal firearms licensees due to their age. FAC ¶¶ 20-21, 26; SOMF ¶¶ 1, 4; Brown Decl. ¶ 4; Weekley Decl. ¶ 4.

Plaintiff West Virginia Citizens Defense League ("WVCDL") ("Organizational Plaintiff") is nonprofit organization dedicated to promoting the right to keep and bear arms. FAC ¶¶ 9-10; SOMF ¶ 7; Masters Decl. ¶ 4. The Organizational Plaintiff has members between the ages of eighteen and twenty-one, FAC ¶¶ 9-10; SOMF ¶ 7; Masters Decl. ¶ 5, including the Individual Plaintiffs, FAC ¶¶ 7-8; SOMF ¶ 8; Brown Decl. ¶ 2; Weekley Decl. ¶ 2; Masters Decl. ¶ 6; and bring this action on behalf of their individual members who would purchase handguns and handgun ammunition from lawful retailers, WVCDL's member FFL handgun retailers who would sell handguns and handgun ammunition to individuals like the Individual Plaintiffs but are prohibited from doing so by the Handgun Ban." FAC ¶¶ 9-10; SOMF ¶ 7; Masters Decl. ¶ 7.

Plaintiff Brown initiated this action *pro se* on August 30, 2022. (ECF Doc. 1). Plaintiffs filed an amended complaint on September 27, 2022, seeking declaratory

and injunctive relief from the Bureau of Alcohol, Tobacco, Firearms and Explosives

("ATF") and federal officials – Director of ATF Steven Dettelbach and Attorney

General Merrick Garland – responsible for enforcing the Handgun Ban. Plaintiffs

alleged that the Handgun Ban was facially unconstitutional for all adults over the

age of eighteen. (ECF Doc. 11).

On December 12, 2022, the Defendants filed a motion to dismiss and a

supporting memorandum of law. (ECF Doc. 23 and 24).

## ARGUMENT

### I.   Standards of Review

The Government has moved to dismiss Plaintiffs' First Amended Complaint

for lack of subject matter jurisdiction and failure to state a claim. *See* Fed. R. Civ. P.

12(b)(1) & (b)(6). In evaluating the Government's motion to dismiss, the court must

"accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the

light most favorable to the plaintiff." *Harvey v. CNN, Inc.,* 2022 U.S. App. LEXIS

24824 *18 (4th Cir. 2022) (internal citations omitted). "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Summary judgment is proper "[w]here the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there [being]

5

no 'genuine issue for trial.'" *Metro. Towers, LLC v. Duff*, 2022 U.S. Dist. LEXIS 100818 *6 (2022) (internal citations omitted).

## II.   The Court Has Article III Jurisdiction

### a.   The Individual Plaintiffs Have Article III Standing

The Government argues the Individual Plaintiffs lack standing because they have forgone "a legally available means by which they may obtain a handgun" by not acquiring a handgun through a gift or some other legally acceptable way, although it concedes that this same argument was rejected by the Fifth Circuit in *NRA I*. Govt. Br. 9-10 & n.7. While the Fifth Circuit precedent is not binding upon this Court, it should certainly be persuasive to arrive at the same result. The injury Plaintiffs have alleged is not an inability to acquire or possess a handgun, it is an inability to purchase one legally from an FFL. *NRA I*, 700 F.3d at 191–92 (citing *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750–57, 755 n.12 (1976)); *see* Brown Decl. ¶¶ 7, 9-10; Weekley Decl. ¶¶ 5-8. That injury gives rise to standing. Unable to purchase handguns directly from FFLs leaves, individuals such as Plaintiffs, left to the uncertainty of the secondary market in which they have a more limited selection of firearms to choose from – perhaps even lacking the model they would prefer entirely. Moreover, these firearms often lack a warranty. Sellers on the secondary market are positioned to engage in predatory practices against individuals, like Plaintiffs, who are unable to purchase directly from FFLs. Lastly, even if Plaintiffs were able to acquire a firearm on the secondary

6

market, they are still unable to purchase ammunition from retailers for the firearms – rendering the mere possession of the firearm meaningless.

b.  The Organizational Plaintiff Has Article III Standing

The court need not address the standing of the Organizational Plaintiff, because the Individual Plaintiffs have standing, and where one plaintiff has standing this Court's jurisdiction is secure. *See Village of Arlington Heights v. Metro. House. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."). Even so, the Organizational Plaintiff has associational standing.[1]

"An association has associational standing when at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020) (internal citations omitted). The Government argues the Organizational Plaintiff has failed the first part of this test for the same reasons it suggests the Individual Plaintiffs lack standing and because Plaintiffs "have failed to specify any member who was allegedly frustrated from selling any particular

---

[1] Defendants argue that Plaintiff Second Amendment Foundation should be dismissed from this lawsuit due to its involvement in *Reese v. ATF*, No. 6:20-cv-01438 (W.D. La. May 5, 2021) and cite two cases to support that proposition. Plaintiffs agree and consent to the voluntary dismissal, *without prejudice*, of Plaintiff Second Amendment Foundation.

handgun to any person," Govt. Br. 11, but as discussed above, Plaintiffs have an injury traceable to Defendants by virtue of the Handgun Ban prohibiting Individual Plaintiffs to purchase of handguns from FFLs. Moreover, Organizational Plaintiff has at least one member FFL who would sell and transfer a handgun and handgun ammunition, to individuals 18-to-20-years-old but for the laws and regulations at issue in this instant action. And while not binding on this Court, the Fifth Circuit rejected such an argument, stating "by prohibiting FFLs from selling handguns to 18-to-20-year-olds, the laws cause those persons concrete, particularized injury— i.e., the injury of not being able to purchase handguns from FFLs." *NRA I*, 700 F.3d at 191-92. *See also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750-57, 755 n.12 (1976) (finding standing for prospective customers to challenge constitutionality of state statute prohibiting pharmacists from advertising prescription drug prices, despite customers' ability to obtain price quotes in another way—over the phone from some pharmacies).

The Government also takes issue with the allegation that a "second category of members— licensed firearms dealers" suffered a concrete and particularized injury. Govt. Br. 11. Plaintiff WVCDL has alleged that those members have lost sales they would otherwise have made to 18-to-20-year-old purchasers if such sales were not prohibited. *See* FAC ¶ 10; Masters Decl. ¶¶ 7-8. Although this allegation is not necessary to establish standing for Organizational Plaintiffs, lost sales by members are concrete injuries, fairly traceable to the Handgun Ban, that give rise

8

to standing for the Organizational Plaintiffs. *See Tex. Assoc. of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 378 (5th Cir. 2021).

## III. The *Bruen* Test

Earlier this year, the Supreme Court reaffirmed the test that is to be applied to Second Amendment challenges, which was previously articulated in *Heller* when it decided *Bruen*. Such challenges are to be analyzed within the framework of the "Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. And "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. Removing any doubt as to the standard, the Supreme Court further declared "[w]e reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2129-30 (internal citations omitted).

## IV. The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791

For this Court to properly apply the test spelled out in *Bruen*, it is imperative that it look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Defendants may rely upon to justify

9

their Handgun Ban. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller*, 554 U. S. at 634-35. (emphasis added). The Second Amendment was adopted in 1791. *See generally* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, (Oct. 1, 2022), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297.

While the Government directs this Court to look at laws adopted in the nineteenth century and beyond to justify its Handgun Ban, Govt. Br. 14-16, the Supreme Court has already dismissed such as improper. To begin, Supreme Court precedent has made clear that with respect to the federal government, 1791 is the proper period to examine to determine the original meaning of the various provisions in the Bill of Rights. *See, e.g.*, *Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."); *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *United States v. Watson*, 423 U.S. 411, 421 (1976) (citing the Second Congress's understanding and grant of arrest powers for a felony without a warrant to federal marshals as consistent with the Fourth Amendment)*; cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance.").

10

There is no reason to look later, since in this case the Second Amendment applies directly against the Government. Regardless, even if incorporation through the Fourteenth Amendment were somehow at issue, the Supreme Court has once again provided guidance as to the proper historical period. "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137-38. *See also Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983) (discussing prayer before legislative sessions and referencing practices of the First Continental Congress, First Congress, Senate and House Committees, and payment of Chaplains to perform such services just three days prior to the agreement on the language of the Bill of Rights); *Furman v. Georgia*, 408 U.S. 238, 319-20 (1972) (tracing history of the Founder's understanding of cruel and unusual punishment from English law through the adoption of the Eighth Amendment); and *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (discussing that the Court looks "to the statutes and common law of the founding era to determine the norms that the Fourth Amendment" protects). While Defendants may prefer to rely on history from a later period, there is no basis in the caselaw for that preference. In *McDonald*, the Court was exactingly clear when it stated that it has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald*, 561 U.S. at 765 (internal quotation marks omitted). And

11

of course, this makes sense. To find that the 1868 understanding controls and that the meaning of the Bill of Rights provision is the same against the states and the federal government, a court would necessarily need to conclude that adopting the Fourteenth Amendment and extending Bill of Rights protections to the states somehow also changed the meaning of those protections when applied to the federal government. This would be counterintuitive and lacks support in precedent. *See Bruen*, 142 S. Ct. at 2163 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." (Barrett, J., concurring)).

No matter which path one travels, all roads lead to 1791. Having set the stage for the proper historical period, attention must be turned to this nation's history and tradition of firearms regulation.

## V. The Second Amendment Does Not Permit the Government to Prohibit 18-to-20-Year-Olds from Purchasing Handguns from Licensed Retailers

*Bruen* established once and for all that the Second Amendment right "to keep and bear arms" means just what it says—that individuals, like Plaintiffs, have a right to keep (or own) all bearable arms in common use for lawful purposes. The right to keep arms necessarily implies there is a right to acquire arms. Plaintiffs' challenge is, therefore, within the scope of the Second Amendment, and the burden is on the Defendants to justify the Handgun Ban. The only possible feature that could differentiate this case from *Bruen* and *Heller* is the Plaintiffs' age, but the Court should reject any argument to that effect. Under *Bruen*, this first question is

a textual one, and here two key elements of the Amendment's text remove any doubt that 18-to-20-year-olds fall within its scope.

First, the Amendment refers to a right of "the people" to keep and bear arms without mentioning age. The "normal and ordinary meaning" of "the people" includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court made clear in *Heller*, "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581 (emphasis added); *accord* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890 (1833) ("The right of the *citizens* to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic.") (emphasis added); *Nunn v. Georgia*, 1 Ga. 243, 250 (1846) ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147).

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, we can see that the Constitution elsewhere explicitly considers and prescribes limits based on age. See, e.g., U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives); id. amend. XXVI (voting age at 18). "In other words, the Founders considered age and knew how to set age requirements but placed no such

13

restrictions on rights, including those protected by the Second Amendment."
*Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), vacated as moot, 14 F.4th
322, 328 (4th Cir. 2021). And in the two other provisions in the Bill of Rights that
explicitly describe a right of "the people" generally, the First and the Fourth
Amendments, the rights extend fully to 18-year-olds and in fact extend to *the whole
people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S.
503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are
possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of
Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334
(1985) ("Equally indisputable is the proposition that the Fourteenth Amendment
protects the rights of students against [unreasonable searches and seizures] by
public school officials."); see also *Hirschfeld*, 5 F.4th at 421. "When the term the
people is made use of . . . in all the enumerations and guaranties of rights [in the
Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL
PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68
(1880). Even where "the people" does not appear, *every other constitutional right*
applies *at least* to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the
right to jury trial, voting, marriage, and sex apply at least to those 18 years old).

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well
regulated Militia, being necessary to the security of a free State . . . ." As *Heller*
explained, this clause "announces the purpose for which the right was codified: to
prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right

14

is not limited to those who were in the militia or eligible for militia service at the Founding, "[l]ogic demands that there be a link between the stated purpose and the command," id. at 577, meaning that if an individual would have been a member of the "militia," at *least* his rights must be protected by the Amendment.

At the Founding, the "militia" was widely understood to refer to the collection of "all able-bodied men," *id*. at 596, including in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age*, Jones v. Bonta*, 34 F.4th 704, 718–19 (9th Cir. 2022) (collecting post-ratification state militia laws). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act, ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified, "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def*., 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right vests by age 18.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

15

*Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), aff'd by *Heller*, 554 U.S. 570; see also *Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834). Although previously "military age ha[d] generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id*. at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be the best age to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington— who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the

16

Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed from the colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983). Plaintiffs are unaware of even a single state that exempted 18- to 20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow extended Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that

17

the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* (quoting Act of May 8, 1792) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the passage of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Id.*; see also *Hirschfeld*, 5 F.4th 407, 429–30 ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right."). As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

18

Finally, it is worth noting that this understanding of the scope of the right, and the importance of the "militia" in the prefatory clause persisted well beyond the time of the Founding. It was still the view in the 19th century following the ratification of the Fourteenth Amendment. As Thomas Cooley wrote in his 1880 treatise, when interpreting the Second Amendment's text,

> [i]t might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose.

COOLEY, *supra*, GENERAL PRINCIPLES at 271. The Court in *Heller* noted: "All other post- Civil War 19th-century sources we have found concurred with Cooley." 554 U.S. at 618. The text of the Amendment cannot be read in any way to exclude 18-to-20-year-olds from its coverage.

## VI. The Handgun Ban Cannot Be Justified by Reference to Historical Analogues

The Second Amendment's text covers an 18-to-20-year-old individual's right to keep handguns. As mentioned *supra*, such necessarily implies a right to acquire such arms. Instead, Defendants offer that rather than being able to exercise the right to acquire arms directly, Plaintiffs may exercise that right through one's parents or guardian gifting a handgun to them, Govt. Br. 1, 11, conditioning the exercise of their Second Amendment rights by the virtue of another's graciousness – hardly the exercise of a right at all. Under *Bruen*, the Handgun Ban is

19

presumptively unconstitutional unless the Defendants can "justify [the] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulations." 142 S. Ct. at 2130. The Supreme Court was exactingly clear: the burden is on the government to *prove* that its Handgun Ban is constitutional, and the only acceptable standard against which to judge its constitutionality is the history of traditional firearm regulation in this country. *Id.*; *see also id.* at 2131 ("The Second Amendment…'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance – struck by the traditions of the American people – that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

Defendants will not be able to carry this burden.

a. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Other Adults

Even before the Founding era, "[t]he tradition of young adults keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. As discussed above, immediately after the Amendment was ratified the age for militia participation was set by every state and the federal government at 18. And the point bears underscoring—militia membership did not just entail an entitlement to own a firearm, it *required* ownership. *United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves."). This requirement means that not only were 18-year-olds

20

at the Founding entrusted with bearing arms during their time participating in militia service, they were also expected to keep and maintain their arms as private citizens. In addition to this "founding-era evidence of militia membership [which] undermines Defendants' interpretation" of the Amendment, young adults were expected to bear arms as part of *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722. Similarly, at common law by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *Second Amendment Rights*, *supra* at 534.

The court in *Jones* likewise found that in the period immediately following ratification "every state's militia law obliged young adults to acquire and possess firearms." 34 F.4th at 719. After exhaustively surveying historical gun regulations related to firearm purchasing by young adults, the Fourth Circuit in *Hirschfeld* concluded that "[w]hile some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856.'" 5 F.4th at 437. Judge Jones in *NRA II* similarly criticized the panel decision for suggesting that restrictions on purchasing by 18-to-20-year-olds were "longstanding" based on evidence of statutes that were, in many cases, not complete bans on purchasing and, like in *Hirschfeld*, dated to 1856 at the very earliest. 714 F.3d at 344 (Jones, J., dissental) ("With its merely general references to firearms regulations at the founding and its only support in

21

regulations against 18-to-20-year-olds late in the 19th century, the panel is unable to prove that banning commercial firearms sales to late teens has any analogue in the founding era."). *See also* Exhibit B to Govt. Br. (ECF Doc. 24-2) (cataloguing states restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of "minors" while the state's age of majority was set at 21 – showing *no laws* in existence until 1856 and finding only two laws in effect prior to the ratification of the Fourteenth Amendment, with three more adopted within ten years of its ratification).[2] There is simply not a shred of evidence from the Founding era of any "historical analogue" that attempted to constrain 18-to-20-year-olds' exercise of their Second Amendment rights in any way like the Handgun Ban does here.

b.   Defendants Citations to 19th Century Sources are Unavailing

As discussed *supra*, the 19th Century is beyond the proper period to determine the historical understanding of the Second Amendment. Regardless, Plaintiffs will address several points Defendants make. Defendants cite to a treatise from 1868 which said that "the State may prohibit the sale of arms to Minors." Thomas M. Cooley, *A Treatise on Constitutional Limitation* 740 n. 4 (6th ed. 1890); Govt. Br. 18. But this quote is from the section discussing the police power of the

---

[2] Even if one were to look twelve years preceding the adoption of the Fourteenth Amendment (Alabama's adoption of such a law in 1856 – the first of its kind according to the Government's Exhibit B (ECF Doc. 24-2)) and twelve years after the adoption of the Fourteenth Amendment, only seven of the thirty-eight states would have adopted such a provision. "As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense'". *Bruen*, 142 S. Ct. at 2153 (quoting *Heller,* 554 U. S. at 632).

state and does not address the Second Amendment or the right to bear arms, and what's more, Cooley's authority for the sentence was *State v. Callicutt*, 69 Tenn. 714 (Tenn. 1878). *Jones*, 34 F.4th at 704. He was not weighing in on the legitimacy of the decision, instead he was "simply identifying [it] as a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout the treatise." David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U.L.J. 119, 143 (2018). Cooley did, however, elsewhere address the right to bear arms, but he specifically did not discuss the legitimacy of restrictions on the right:

> [H]ow far it may be in the power of the legislature to regulate the right [to keep and bear arms] we shall not undertake to say. Happily, there neither has been, nor, we may hope, is likely to be, much occasion for an examination of that question by the courts.

*Cooley*, supra at 427.

And to be sure *Callicut* is equally unpersuasive. As the *Jones* Court noted, the Tennessee court "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. Defendants' reliance on *Coleman v. State*, 32 Ala. 581 (1858) fairs no better. The *Jones* Court also reviewed this case, finding that "the court did not address the constitutionality of the law or say how old the minor was." *Jones*, 34 F.4th at 720.

Next, Defendants argue that at the time of the adoption of the Constitution, the age of majority at common law was 21 years. Govt. Br. 14. This cuts against their position, as it would render any law prior to about 1970 a law that only

restricted the rights of minors. Such would not be analogous to the present-day restrictions imposed by the Handgun Ban on the rights of legal adults.

## CONCLUSION

For these reasons, this Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Summary Judgment, declare the Handgun Ban unconstitutional, and enjoin its enforcement against Plaintiffs and their members.

Dated: January 3, 2023                    Respectfully submitted,

/s/ John H. Bryan
John H. Bryan
(WV Bar No. 10259)
JOHN H. BRYAN,
ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com

/s/ Adam Kraut
Adam Kraut
KRAUT AND KRAUT
P.O. Box 101
Westtown, PA 19395
(610) 696-8200
Adam@Krautlaw.com
*Admitted Pro Hac Vice*

*Counsel for Plaintiffs*