[PUBLISH]

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12314

_____

NATIONAL RIFLE ASSOCIATION,
RADFORD FANT,

                                        Plaintiffs-Appellants.

*versus*

PAM BONDI,
In her official capacity as Attorney General of Florida, et al.,

                                        Defendants,

COMMISSIONER, FLORIDA DEPARTMENT
OF LAW ENFORCEMENT,

Defendant-Appellee.

––––––––––––––––––––––

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:18-cv-00137-MW-MAF

––––––––––––––––––––––

Before WILSON, ROSENBAUM, Circuit Judges, and CONWAY,[*]
District Judge.

ROSENBAUM, Circuit Judge:

In Ohio, a 19-year-old son shoots and kills his father to
"aveng[e] the wrongs of [his] mother."[1]  In Philadelphia, an 18-
year-old "youth" shoots a 14-year-old girl before turning the gun
on himself "because she would not love him."[2]  In New York, a 20-
year-old shoots and kills his "lover" out of jealousy.[3]  In Washing-
ton, D.C., a 19-year-old shoots and kills his mother, marking

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle
District of Florida, sitting by designation.

[1] *The Walworth Tragedy*, HIGHLAND WEEKLY NEWS, June 26, 1873, at p.1.

[2] *Crimes and Casualties*, MILAN EXCHANGE (Milan, Tenn.), Oct. 18, 1884, p.6.

[3] *News Items*, JUNIATA SENTINEL & REPUBLICAN, Apr. 19, 1876, at p.2.

another death due to "the careless use of firearms."[4]  In Texas, a 19-year-old shoots a police officer because of an "[o]ld [f]eud" between the police officer and the 19-year-old's father.[5]

These stories are ripped from the headlines—the Reconstruction Era headlines, that is.  But they could have been taken from today's news.  Unfortunately, they illustrate a persistent societal problem.  Even though 18-to-20-year-olds now account for less than 4% of the population, they are responsible for more than 15% of homicide and manslaughter arrests.[6]

And in the more than 150 years since Reconstruction began, guns have gotten only deadlier: automatic assault rifles can shoot sixty rounds per minute with enough force to liquefy organs.[7]

---

[4] *Accidental Shooting of a Lady, By Her Son*, EVENING STAR (D.C.), Jan. 23, 1872, at p.1.

[5] *Shooting Affray*, FORT WORTH DAILY GAZETTE, Nov. 7, 1884, at p.8.

[6] *Crime in the United States*, U.S. DEP'T OF JUST. (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38#:~:text=Arrests%2C%20by%20Age%2C%202019%20In%202019%2C%2093.0%20percent,88.9%20percent%20of%20persons%20arrested%20for%20property%20crimes; *Age and Sex Composition in the United States: 2021*, U.S. CENSUS BUREAU (2021), https://www.census.gov/data/tables/2021/demo/age-and-sex/2021-age-sex-composition.html.

[7] *E.g.*, Scott Pelly, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters*, CBS NEWS (May 22, 2022), https://www.cbsnews.com/news/ar-15-mass-shootings-60-minutes-2022-05-29/.

Tragically, under-21-year-old gunmen continue to intentionally target others—now, with disturbing regularity, in schools. So along with math, English, and science, schoolchildren must become proficient in running, hiding, and fighting armed gunmen in schools. Their lives depend upon it.

But State governments have never been required to stand idly by and watch the carnage rage. In fact, during the Reconstruction Era—when the people adopted the Fourteenth Amendment, thereby making the Second Amendment applicable to the States— many States responded to gun violence by 18-to-20-year-olds by prohibiting that age group from even possessing deadly weapons like pistols.

Acting well within that longstanding tradition, Florida responded to a 19-year-old's horrific massacre of students, teachers, and coaches at Marjory Stoneman Douglas High School in a far more restrained way. The Marjory Stoneman Douglas High School Public Safety Act ("the Act") precludes those under 21 only from buying firearms while still leaving that age group free to possess and use firearms of any legal type. *See* 2018 Fla. Laws 10, 18–19 (codified at Fla. Stat. § 790.065(13)).

That kind of law is consistent with our Nation's historical tradition of firearm regulation. Indeed, the Supreme Court has already identified "laws imposing conditions and qualifications on the commercial sale of firearms" as "longstanding" and therefore "presumptively lawful" firearm regulations. *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008). Florida's law does

just that by imposing a minimum age as a qualification for buying firearms.

Because Florida's law is consistent with our Nation's historical tradition of firearm regulation, we affirm the district court's judgment.

## I.

After a 19-year-old shot and killed seventeen people at Marjory Stoneman Douglas High School, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which bans the sale of firearms to 18-to-20-year-olds. *See* 2018 Fla. Laws 10, 18–19 (codified at Fla. Stat. § 790.065(13)).  In doing so, the Legislature sought "to comprehensively address the crisis of gun violence, including but not limited to, gun violence on school campuses." *Id.* at 10.

Shortly after the law passed, the NRA challenged it, alleging that the law violates the Second and Fourteenth Amendments. The parties eventually filed cross-motions for summary judgment, and the district court ruled in Florida's favor.  The NRA then filed this appeal.[8]

---

[8] We appreciate and respect our colleague Judge Wilson's position that he would rather wait to resolve this appeal until the Florida legislature completes its consideration of H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023), to see whether any new legislation moots the pending appeal.  But most respectfully, we see things differently.  We issue our opinion today because the opinion resolves a

## II.

Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Supreme Court has held that that provision guarantees an "individual right to possess and carry weapons in case of

---

case that remains very much alive, and the parties have come to us to resolve it.

First, this case is not (and may never become) moot. For it to become moot at some point down the road, several contingencies would need to occur. For starters, the bill must pass out of the House Committee, pass the House floor, pass out of the Senate Committee, pass the Senate floor, and be signed by the Governor. None of these things have yet occurred and they may never happen. And the mootness scenario is even less likely than that because H.B. 1543 is at the very beginning of the legislative process (having been filed two days ago). So even if some form of H.B. 1543 is eventually enacted, we do not know whether the enacted version would completely moot this case. For instance, the legislature could amend the bill and decide to enact a version of H.B. 1543 that changes the minimum age for buying firearms to twenty or nineteen as some type of compromise position. Either way, the resulting law would not moot this case.

Add to that the fact that this case has been pending for some time, and the parties have endured two rounds of briefing (before and after the Supreme Court issued *Bruen*) and oral argument to have us resolve it. Neither party has asked us to stay our consideration of this case pending resolution of H.B. 1543. Given these circumstances—the speculative nature of any possible mootness scenario and the fact that neither party has asked us to wait to see whether any mootness potentiality materializes—we think we should resolve the parties' disagreement without further delay.

confrontation." *Heller*, 554 U.S. at 592.  But that right "is not un-limited." *Id.* at 626.

After the Supreme Court decided *Heller*, we applied a two-part test to analyze the Second Amendment's limits.  First, we asked whether the Second Amendment protected the conduct that the government sought to restrict.  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012).  If so, we then evaluated the law under the appropriate level of means-end scrutiny.  *Ibid.*

But the Supreme Court abrogated step two of this framework in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).  Now, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126.  To rebut that presumption, "the government must demonstrate that" a state's "regulation" of that conduct "is consistent with this Nation's historical tradition of firearm regulation." *Id.*  In other words, if "the Second Amendment's plain text covers an individual's conduct," then "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126–27.

Like the Fifth Circuit, we read *Bruen* as articulating two analytical steps.  *See United States v. Rahimi*, 59 F. 4th 163, 173 (5th Cir. 2023) (observing that "*Bruen* articulated two analytical steps").  First, we consider the plain text of the Amendment, as informed by the historical tradition.  Second, we look for a historical analogue—

not a historical "dead ringer," *Bruen*, 142 S. Ct. at 2118—of the challenged law. *Bruen* therefore brings historical sources to bear on both inquires.

In our view, though, the Reconstruction Era historical sources are the most relevant to our inquiry on the scope of the right to keep and bear arms. That is so because those sources reflect the public understanding of the right to keep and bear arms at the very time the states made that right applicable to the state governments by ratifying the Fourteenth Amendment.

## A. Historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era.

We begin by explaining why historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era. In short, because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters.

To start, the Supreme Court has explained that historical sources are relevant because the Constitution's "meaning is fixed according to the understandings of those who ratified it," *Bruen*, 142 S. Ct. at 2132. But "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. As the Supreme Court itself has declared, "Constitutional rights are enshrined with

the scope they were understood to have *when the people adopted them.*" *Id.* (emphasis added by *Bruen* Court) (quoting *Heller*, 554 U.S. at 634–35).

It is that understanding—the one shared by those who ratified and adopted the relevant constitutional provision—that serves as originalism's claim to democratic legitimacy. *See, e.g.*, *Heller*, 554 U.S. at 634–35 (describing the "enumeration of a right" as "the very product of an interest balancing by the people"); Michael C. Dorf, *Integrating Normative and Descriptive Constitutional Theory: The Case of Original Meaning*, 85 Geo. L.J. 1765, 1810 (1997) ("The traditional view of originalism perceives legitimacy as deriving from the act of lawmaking."). In other words, we must respect the choice that those who bound themselves to be governed by the constitutional provision in question understood themselves to be making when they ratified the constitutional provision.

The people who adopted the Second Amendment shared the understanding that it "applied only to the Federal Government." *McDonald v. City of Chicago*, 561 U.S. at 742, 754 (2010) (plurality opinion); *see also id.* at 806 (Thomas, J., concurring in part and concurring in the judgment).

But when the States ratified the Fourteenth Amendment during the Reconstruction Era, they made the Second Amendment applicable to the States. As the Supreme Court has explained, the ratification of the Fourteenth Amendment "incorporated almost all of the provisions of the Bill of Rights." *Id.* at 764 (plurality opinion).

As a result, those rights now apply to the state and federal governments alike. *Id.* at 765–66.[9]

The key takeaway from this bit of history is that the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137 (citing *Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 250–51 (1833)). And so the understanding of the Second Amendment right that ought to control in this case—where a State law is at issue—is the one shared by the people who adopted "the Fourteenth Amendment, not the Second." *Id.*[10]

---

[9] The "one exception to this general rule" permits states to convict criminal defendants without a unanimous jury, even though "the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials." *Id.* at 766 n.14.

[10] Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (Sykes, J.); *see also, e.g.*, Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 223 (1998) (observing "that when we 'apply' the Bill of Rights to the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment was Ratified in 1868: What Rights are Deeply Rooted in History and Tradition?*, 87 Tex. L. Rev. 7, 115–16 (2004) (asserting that "Amar is exactly right"—"the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868"); Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in*

The Supreme Court has not yet decided this question, although it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," *Bruen*, 142 S. Ct. at 2137. But an assumption is not a holding. *See, e.g.*, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (explaining that the Supreme Court's "assumptions are not holdings"). To the contrary, the Supreme Court in *Bruen* expressly declined to decide whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." 142 S. Ct. at 2138.

The *Bruen* Court did not need to decide the question because it read the historical record to yield the conclusion that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry"—the specific Second Amendment right at issue there. *Id.* Yet even if that is true for public carry, "the core applications and central meanings of the right to keep and bear arms . . . were very different in 1866 than in 1789." Amar, *The Bill of Rights: Creation and Reconstruction*, *supra*, at 223. Because the understanding of the right to keep and bear arms in 1866 generally

---

*2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 GEO J.L. & PUB. POL'Y 1, 52–53 (2010).

differed from the understanding of that right in 1789, *Bruen* is likely an exception in its ability to assume away the differences. 142 S. Ct. at 2138. For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding. And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.

What the Supreme Court has said, though, is that the "individual rights enumerated in the Bill of Rights and made applicable against the states through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137. So the Second Amendment right to keep and bear arms (restricting the federal government) and the Fourteenth Amendment right to keep and bear arms (restricting State governments) share the same scope.

Yet the right's contours turn on the understanding that prevailed at the time of the later ratification—that is, when the Fourteenth Amendment was ratified.

This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." 142 S. Ct. at 2136 (citation omitted). As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that

it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." *See Miccosukee Tribes of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1299 (11th Cir. 2010) (explaining the rule as it applies to statutes).

The opposite rule would be illogical. After all, it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth Amendment.

**B. For purposes of this opinion, we assume without deciding that the Second Amendment's plain text covers persons between eighteen and twenty years old when they seek to buy a firearm.**

Having concluded that historical sources from the Reconstruction Era are more probative than those from the Founding Era on the scope of the Second Amendment right, we now apply *Bruen*'s two analytical steps.

*Bruen*'s first analytical step asks whether "the Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126. This question has two components. We begin by asking whether the individual—here, an 18-to-20-year-old—is among "'the people' whom the Second Amendment protects." *Id.* at 2134 (citation omitted); *see also Heller*, 572 U.S. at 579 (observing that the "first salient feature of the [Second Amendment's] operative clause is that it codifies a 'right of the people.'"). If so, we

"turn to whether the plain text of the Second Amendment protects" that individual's "proposed course of conduct" (here, buying firearms). *Bruen*, 142 S. Ct. at 2134.

Once both components are satisfied, we advance to *Bruen*'s second step. There, the burden shifts to the government to demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

As to the first component of *Bruen*'s first step, it's not clear whether 18-to-20-year-olds "are part of 'the people' whom the Second Amendment protects," *id.* at 2134 (citation omitted). In *Bruen*, the "pleadings" described the petitioners as "law-abiding, *adult citizens* of Rensselaer County, New York." *Id.* at 2124–25 (emphasis added). The Court then repeated that description of the petitioners before concluding that the petitioners "[we]re part of 'the people' whom the Second Amendment protects." *Id.* at 2134. But the historical record reveals that 18-to-20-year-olds did not enjoy the full range of civil and political rights that adults did. *See infra* at 30–31. And even today, 18-to-20-year-olds do not share all the rights that those over 21 do. For instance, the drinking age and tobacco-use age in most states is 21.[11]

---

[11] *See., e.g.*, 23 U.S.C. § 158 (directing the Secretary of Transportation to withhold money from states with a drinking age of under 21); *South Dakota v. Dole*, 483 U.S. 203 (1987) (holding that 28 U.S.C. "§ 158 is a valid use of the spending power").

In this case, Florida does not dispute the NRA's contention that 18-to-20-year-olds are part of "the people" whom the Second Amendment protects.  So we will assume that 18-to-20-year-olds are part of the people whom the Second Amendment protects.

Next up is the second component of *Bruen*'s first step.  The question there is whether the Second Amendment's "plain text" covers 18-to-20-year-olds' "proposed course of conduct"—that is, buying firearms.  *Bruen*, 142 S. Ct. at 2134.  Of course, the Second Amendment's plain text includes only a right "to keep and bear arms," not a right to buy them.  U.S. Const. amend II.  That said, our sister circuits have found that the right to keep and bear arms includes the right to acquire them.  *See Teixeria v. Cnty of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *Ezell*, 651 F.3d at 704.

We need not decide this question today.  Rather, we can assume for now that "the Second Amendment's plain text" covers 18-to-20-year-olds when they buy firearms.  *Bruen*, 142 S. Ct. at 2126.

**C.  The Act's restriction on the sale of firearms to 18-to-20-year-olds is consistent with this Nation's relevant historical tradition of firearm regulation.**

Given our assumption that the Second Amendment's plain text provides some level of coverage for (a) 18-to-20-year-olds who seek (b) to buy firearms, we move on to *Bruen*'s second analytical step.  Here, Florida "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer

bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

This inquiry entails "reasoning by analogy" to determine whether historical firearms regulations are "relevantly similar" the challenged modern regulation. *Bruen*, 142 S. Ct. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). We evaluate two metrics to determine whether historical and modern firearms regulations are "relevantly similar": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Here, "a well-established and representative historical analogue" exists for Florida's challenged law. *Id.* In fact, the historical record shows that regulations from the Reconstruction Era burdened law-abiding citizens' rights to armed self-defense to an even greater extent and for the same reason as the Act does. In other words, at *Bruen*'s second step, Florida has satisfied its burden as to both the "how" and the "why."

We begin with the "how"—that is, how the Act's historical analogues similarly (and, in most cases, more severely) burdened Second Amendment rights for 18-to-20-year-olds. Alabama, Tennessee, and Kentucky led the charge in passing laws that prohibited 18-to-20-year-olds from buying (or even possessing) arms. Twelve years before the Fourteenth Amendment's ratification—and

continuing through the Reconstruction Era[12]—Alabama prohib-ited selling, giving, or lending, "to any male minor, a bowie knife, or knife, or instrument of the like kind or description, by whatever named called, or air gun, or pistol," 1855 Ala. Laws 17.   At that time, the age of majority in Alabama was twenty-one years.[13]  In other words, in 1856, Alabama law prohibited the sale (and even the giving or lending) of handguns and other handheld, smaller arms to 18-to-20-year-olds.

Two years later, Tennessee codified a similar law.  Tennessee's law prohibited selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling," TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858).  At that time, the age of majority in Tennessee was twenty-

---

[12] *See, e.g.*, ALA. CODE. § 4230 (1876), *reprinted in* The Code of Alabama 1876 901 (Wade Keyes & Fern. M. Wood eds. 1877).

[13] *See, e.g., Brown v. Beason*, 24 Ala. 466, 466 (1854) (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing "a minor under the age of twenty-one years"); *Vincent v. Rogers*, 30 Ala. 471, 473 (1857) (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract).

one years old.[14]   Like Alabama's law, Tennessee's law persisted through the Reconstruction Era.  *See State v. Callicutt*, 69 Tenn. 714, 714 (1878) (explaining that Section "4864 of the Code . . . makes it a misdemeanor to sell, give, or loan a minor a pistol or other dangerous weapon").

Kentucky followed suit within a year.  It enacted a law that prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon . . . to any minor," 1859 Ky. Acts 245, § 23.  The law contained an exception that allowed parents or guardians to give, lend, or sell deadly weapons to their minor children.  *See id.*  At that time, the age of majority in Kentucky was twenty-one years old.[15]   Kentucky's law prohibiting the sale of firearms to minors also persisted through the Reconstruction Era.  *See* ch. 29 KY. CODE § 1 (1877), *reprinted in* The General Statutes of Kentucky 359 (J.F. Bullitt & John Feland eds. 1877).

In sum, then, Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the Fourteenth Amendment's ratification.  Because those laws made it unlawful not only to sell those types of arms to 18-to-20-year-olds, but also to lend those arms to that age group, those laws imposed a greater

---

[14] *See, e.g., Warwick v. Cooper*, 37 Tenn. 659, 660–61 (1858) (describing "an infant under the age of twenty-one"); *Seay v. Bacon*, 36 Tenn. 99, 102 (1856).

[15] *See, e.g., Newland v. Gentry*, 57 Ky. 666, 671 (1857).

burden on the right to keep and bear arms than does the Act, which (as Florida concedes) leaves 18-to-20-year-olds free to obtain firearms through legal means other than purchasing. *See* Fla. Stat. § 790.065(13) ("A person younger than 21 years of age may not *purchase* a firearm.") (emphasis added).

On that score, Florida's law and Kentucky's law impose similar burdens on the right to keep and bear arms for self-defense: Kentucky left parents and guardians free to provide a "pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon" to their minor child, 1859 Ky. Acts 245, § 23, while Florida allows anyone to give or loan (but not sell) firearms to 18-to-20-year-olds. Because both laws leave pathways for 18-to-20-year-olds to acquire weapons, both laws impose similar burdens.

As for the "why" of those historical regulations, it is also "relevantly similar" to the "why" of the Marjory Stoneman Douglas High School Public Safety Act. Both "regulations burden a law-abiding citizen's right to armed self-defense" for the same reason: enhancing public safety. *Bruen*, 142 S. Ct. at 2132–33. Indeed, Tennessee and Kentucky passed their regulations in tandem with laws that prohibited giving spirits to minors,[16] demonstrating those

---

[16] *See* TENN. CODE § 4863 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (prohibiting the selling, giving, or delivering "to any minor, or any other person for the use of such minor, any of the liquors specified" elsewhere in the code); 1859 Ky. Acts 245, §§ 22, 24 (prohibiting selling, giving, or loaning "spiritous liquors" or "playing cards" to minors).

states' understandings that alcohol and firearms both represented dangers to minors' safety. *See also infra* at 25–27 (discussing the public's understanding that these laws aimed to advance public safety). By passing the Act, Florida also aims to "enhance public safety" by addressing "gun violence on school campuses." 2018 Fla. Laws 10.

And that is well in keeping with traditional firearm regulations. Public universities have long prohibited students from possessing firearms on their campuses. On August 9, 1810, for instance, the University of Georgia passed a resolution that prohibited students from keeping "any gun, pistol," or "other offensive weapon in College or elsewhere," meaning that students could not possess such weapons even while they were away from college.[17] Just over a decade later, the University of Virginia passed a resolution—with supporting votes from Thomas Jefferson and James Madison—that prohibited students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds.[18] The University of North Carolina similarly prohibited students from

---

[17] *See* University of Georgia Libraries, *The Minutes of the Senatus Academicus 1799–1842* (Nov. 4, 1976), https://perma.cc/VVT2-KFDB.

[18] *University of Virginia Board of Visitors Minutes*, ENCYC. VA. (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/.

keeping "firearms, or gunpowder" by the mid-nineteenth century.[19]

That context serves as the backdrop for the flurry of state regulations, enacted soon after the Fourteenth Amendment's ratification, that banned the sale of firearms to all 18-to-20-year-olds—on or off a college campus. Between the Fourteenth Amendment's ratification and the close of the nineteenth century,[20] at least sixteen states and the District of Columbia joined Alabama, Kentucky,

---

[19] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838).

[20] The Supreme Court looks to post-enactment history because "a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution." *Bruen*, 142 S. Ct. at 2136 (cleaned up); *see also NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (explaining how the Supreme "Court has treated practice as an important interpretive factor . . . even when that practice began after the founding era"); *cf. The Pocket Veto Case*, 279 U.S. 655, 689 (1929) (explaining that "settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions"). Of course, when post-enactment practice *differs* from pre-enactment practice, the post-enactment practice cannot override the pre-enactment practice. *Cf. Bruen*, 142 S. Ct. at 2137. But both *Heller* and *Bruen* used post-enactment practice as "confirmation of what the Court thought had already been established." *Id.* (citation omitted); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting) ("Although we have sometimes looked to cases postdating the founding era as evidence of common-law traditions, we have never done so . . . where the practice of later courts was so divergent."). Here, the post-enactment laws were similar to (and in some cases, the same as) the pre-enactment laws.

and Tennessee—a total of at least twenty jurisdictions—in banning sales of firearms to 18-to-20-year-olds.  *See* Appendix (collecting laws).  These regulations, like their pre-ratification predecessors, were state responses to the problem of deaths and injuries that underage firearm users inflicted.

Many of those post-ratification regulations were similar, if not identical, to their pre-ratification predecessors in Alabama, Tennessee, and Kentucky.  Maryland, for example, made it "unlawful" for anyone "to sell, barter, or give away any firearm whatsoever or other deadly weapon, except for shot guns, fowling pieces and rifles to any person who is a minor under the age of twenty-one years."  1882 Md. Laws 656; *see also, e.g.*, 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon").

Unlike those laws, the Act leaves 18-to-20-year-olds free to acquire firearms of any legal type—so long as they don't buy them.

True, the Act and its Reconstruction Era analogues apply to overlapping, but not coextensive classes of arms.  But for two reasons, the Reconstruction Era statutes are "similarly relevant" and no less burdensome to 18-to-20-year-olds' Second Amendment rights than the Act.

First, the Reconstruction Era statutes and the Act are "similarly relevant" because both apply broadly to many—though not all—types of "arms" under the Second Amendment.  The term

"arms" has long been understood to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quoting 1 A New and Complete Dictionary). Besides firearms, this definition included "bows and arrows" and other weapons suited for self-defense. *Ibid.* So while the Act covers all firearms and thus handguns, *see* Fla. Stat. § 760.065(13)—but not "arms" that are not firearms—we assume for purposes of this opinion that the Reconstruction Era laws applied to handguns (but not long guns) and non-firearm types of deadly weapons like dirks and bowie knifes.[21]  *See, e.g.*, 1883 Wis. Sess. Laws 290 (covering only "pistol[s]" and "revolver[s]"); 1884 Iowa Acts 86 (covering only "pistol[s], revolver[s] or toy pistol[s]"); 1881 Ill. Laws 73 (covering only "pistol[s], revolver[s], derringer[s], bowie knife[s], dirk[s] or other deadly

---

[21] Some might suggest that the catch-all phrase "other deadly weapons of like character" includes long guns. Good arguments exist on both sides of the question. For instance, at least one state had an explicit carveout for long guns. *See, e.g.*, TENN. CODE § 4864 (1858). That might indicate that the drafters of the provision saw the catch-all phrase as covering long guns, or else there would have been no need to expressly exclude them. But on the other side of the coin, the ejusdem generis canon counsels against construing the statutes as covering long guns, *see, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012), because the class of weapons that precedes the catch-all phrase includes only smaller, handheld arms. So long guns, which are neither smaller nor handheld, are not of the same type as the list of weapons preceding the catch-all phrase. We need not resolve that debate here. Instead, we simply assume for purposes of this opinion that the statutes do not cover long guns.

weapon[s] of like character"). In other words, both the Act and its Reconstruction Era predecessors apply to the sale of handguns and some other class of arms to minors.

And second, the Reconstruction Era statutes prohibited selling, giving, or loaning handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 630—to 18-to-20-year-olds. As a result, those statutes are at least as burdensome to 18-to-20-year-olds' Second Amendment rights as the Act. For while the Act also bans the sale of handguns to 18-to-20-year-olds, unlike its Reconstruction Era predecessors, the Act leaves open avenues for 18-to-20-year-olds to acquire that "quintessential self-defense weapon," *id.*, (as well as long guns). Thus, we have no trouble concluding that the Reconstruction Era statutes serve as historical analogues for the Act. We are not concerned that the Act and its Reconstruction Era predecessors are not precisely the same because they need be only analogues, not twins, *Bruen*, 142 S. Ct. at 2133, and for the reasons we've discussed, they surely are that.

Our conclusion that Florida's "firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, finds further support from Reconstruction Era newspapers. As the Supreme Court has explained, the "discussion of the Second Amendment . . . in public discourse after the Civil War" can shed important light on the public understanding of a right at the time of the ratification of the Fourteenth Amendment. *Id.* at 2128 (citation and quotation marks omitted). To ascertain "widely held" views, the Supreme

Court has consulted, among other sources, newspaper "editorial[s]." *See*, *e.g.*, *Heller*, 554 U.S. at 615 (relying on "an editorial" to conclude that a "view . . . was . . . widely held").  We follow the Supreme Court's lead.

Based on newspapers from the Reconstruction Era, historians have confirmed that the public did not understand the right to keep and bear arms to protect the rights of 18-to-20-year-olds to purchase such weapons.  In fact, much of the public at the time supported restrictions.  *See* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019) (noting that "lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of firearm-related injuries at the hands of minors"); *see also*, *e.g.*, *id.* at 172 (noting that "the general public" did not view laws "prohibiting minors from using firearms" as "a violation of the Second Amendment or the right to arms"); *The Law Interferes*, N.Y. Trib., Feb. 22, 1884, p.4 (urging the legislature to "regulate the sale of . . . so-called toy-pistols" because minors "ought not to be trusted with deadly weapons");[22] *Law in the*

_____

[22] Despite the moniker "toy guns," in the Reconstruction Era, little difference existed between so-called "toy guns" and real guns.  *See* Catie Carberry, *The Origins of Toy Guns in America*, Duke Ctr. for Firearms L. (July 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/ (observing that "states initially struggled to differentiate between toy guns and real guns"); *see also id.* (noting, for instance, that under a "Pennsylvania statute from 1883, toy (or imitation guns) were 'arranged as to be capable of being

*Interest of Civilization*, Kenosha Tel., Feb. 9, 1883, p.2 ("The bill introduced in the early part of the present session, prohibiting the selling of pistols or revolvers to minors, and forbidding the carrying of such by minors, ought not to fail of becoming a law."); *General Gossip*, Salt Lake Herald, Feb. 22, 1884, p.8 (describing "toy pistols" as "murderous nuisances" and opining that "[t]he Legislative Council did a wise and proper thing in passing the bill to prevent the sale of giving away of toy pistols to minors"); *The City Law Business*, Daily Gazette (Wilmington, Del.), July 16, 1880, p. 1 ("As the Legislature will meet during next winter, I suggest that a committee on legislation be appointed at an early day so that mature consideration may be given to matters on which it may be deemed important to invoke the aid of the Legislature; such as . . . the sale of fire-arms and toy pistols to minors . . . ."); *Monmouth Musings*, Monmouth Inquirer, June 14, 1883, p.3 ("The first conviction in the State under the new law to prevent the sale of pistols to minors, took place in Paterson recently, where a junk dealer was fined ten dollars and costs for its violation.  It should be strictly enforced in this County."); *The Deadly Toy Pistol*, Evening Star (D.C.), July 21, 1881, p.4 (expressing approval of "[t]he first arrest for selling dangerous toy pistols to minors"); *Our Harvest*, Mower Cnty. Transcript, Sept. 6, 1882, p.2 ("The LeRoy *Independent*

---

loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged"').

thinks there ought to be a law against the carrying of pistols and revolvers by minors . . . .").

It would be odd indeed if the people who adopted the Fourteenth Amendment did so with the understanding that it would invalidate widely adopted and widely approved-of gun regulations at the time.

The courts generally shared the public's approval of laws that prohibited providing handguns and other dangerous weapons to minors.  Take the Supreme Court of Tennessee.  In 1871, that court "held that a statute that forbade openly carrying a pistol . . . violated the state constitutional provision (which the court equated with the Second Amendment)."  *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)).  Seven years later, that same court described Section 4864 of Tennessee's Code—which prohibited "the sale, gift, or loan of a pistol or other like dangerous weapon to a minor"—as "not only constitutional . . . but wise and salutary in all its provisions."  *Callicutt*, 69 Tenn. at 716–17; *see also Dabbs v. State*, 39 Ark. 353, 357 (1882) (placing a law that banned the sale of firearms in the same permissible "category" as laws regulating "gaming, the keeping of bawdy-houses," and "the sale of spirituous liquors").

The Supreme Court has also directed us to consult contemporaneous legal commentators to discern the public understanding of the right at the time of ratification.  *Bruen*, 142 S. Ct. at 2128.  Here, legal commentators viewed the Reconstruction Era statutes as constitutional.  Thomas Cooley "wrote a massively popular 1868

Treatise on Constitutional Limitations." *Heller*, 554 U.S. at 616. Cooley's treatise espoused the view that states could use their police power to prohibit the sale of arms to minors. Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

Given these facts, it should come as no surprise that our research indicates that laws prohibiting the sale of arms to minors went virtually "unchallenged," *Bruen*, 142 S. Ct. at 2137, from their enactment through the middle of the nineteenth century. In fact, our research suggests that a litigant challenged a law banning the sale of arms to minors only once during that time frame. *See Callicutt*, 69 Tenn. at 716–17 (rejecting a challenge to Tennessee's statute, which banned selling, loaning, or even giving handguns and other arms to minors). And the Supreme Court has recognized that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision" (quoting *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in the judgment)). We can see no reason why, when we are construing a constitutional provision incorporated against the States by the Fourteenth Amendment the rule should be any different where a governmental practice has been open, widespread, and unchallenged since the early days of the Reconstruction Era ratification. Indeed, the fact that there was apparently only a single challenge to these twenty statutes' constitutionality until well into the twentieth century suggests that the public understanding at the

time of the ratification considered the statutory prohibitions constitutionally permissible.

Based on the historical record, we can distill two key points. First, several states burdened 18-to-20-year-olds' rights to keep and bear arms—both before and after the Fourteenth Amendment's ratification—by making it unlawful even to give or lend handguns and other deadly weapons to minors.  In total, at least nineteen states and the District of Columbia banned the sale and even the giving or loaning of handguns and other deadly weapons to 18-to-20-year-olds by the close of the nineteenth century.  Second, those states did so to enhance public safety.

These points show that the Marjory Stoneman Douglas High School Public Safety Act "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. To begin with, the Act is no more restrictive than its forebearers: while the Act burdens 18-to-20-year-olds' rights to buy firearms, unlike its Reconstruction Era analogues, it still leaves 18-to-20-year-olds free to acquire any type of firearm—including "the quintessential self-defense weapon," the handgun, *Heller*, 554 U.S. at 630—in legal ways, as long as they don't buy the weapons.

The Act also aims to improve public safety just like its historical analogues sought to do—that is, the Act has an analogous "why."

So the Act and its historical predecessors are "relevantly similar under the Second Amendment." *Bruen*, 142 S. Ct. at 2132.

And for that reason, the Act does not infringe on the right to keep and bear arms.  *See id.* at 2161 (Kavanaugh, J., concurring) (explaining that *Bruen* articulates the test "for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense").

Trying to avoid this conclusion, the NRA responds that that Founding Era federal law obliged 18-to-20-year-olds to join the militia.  *See, e.g.*, Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271 (requiring "each and every free able-bodied white citizen" that is over "the age of eighteen years, and under the age of forty-five years" to "enroll[] in the militia").  In other words, the NRA contends that the fact that Congress required 18-to-20-year-olds to muster for the militia is compelling evidence that 18-to-20-year-olds had the right to an unimpeded ability to purchase firearms.

The NRA's conclusion is incorrect.  The NRA mistakes a legal obligation for a right.  *See Heller*, 554 U.S. at 605 (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id.* at 582, 601, 608, 610, 611, 612, 613, 616, 617.  The fact that federal law obliged 18-to-20-year-olds to join the militia does not mean that 18-to-20-year-olds had an absolute right to buy arms.

To the contrary, the historical record shows that merely being part of the militia did not entitle 18-to-20-year-olds to enjoy the same political and civil rights as adults.  *See, e.g.*, Corinne T. Field, *The Struggle for Equal Adulthood: Gender, Race, Age, and the Fight for Citizenship in Antebellum America* 55 (2014) (explaining

that, during the early nineteenth century, the "relevance of chronological age stood out most sharply in the celebration of age twenty-one as a transition to full citizenship for white men"). For instance, the Tennessee Supreme Court expressly rejected the argument that "every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him" firearms and concluded instead that Tennessee's prohibition on the sale, gifting, or lending of firearms to those under 21 "d[id] not in fact abridge, the constitutional right of the 'citizens of the State to keep and bear arms for their common defense.'" *Callicutt*, 69 Tenn. at 716.

In other words, Congress imposed upon 18-to-20-year-olds a specific obligation to serve in the militia but did not give them all the rights associated with full citizenship (like, at that time, the right to vote). So we can't infer from the fact that 18-to-20-year-olds had a specific obligation that they had a specific right.

Plus, even assuming that the Founding Era federal mustering obligations could be viewed as entitling 18-to-20-year-olds to buy firearms in 1791, that's not the public understanding that prevails here. Rather, it's clear that the public understanding of the Second Amendment at the time of the Fourteenth Amendment's ratification—as demonstrated by the wealth of Fourteenth Amendment-Ratification Era analogues for Florida's law—permitted the states to limit the sale of firearms to those 21 and older. *See* Appendix (collecting laws that banned 18-to-20-year-olds from buying

or possessing firearms).  So even if federal law obliged 18-to-20-year-olds to muster for the militia, laws banning that same group from buying firearms do not infringe on the right to keep and bear arms.  And the fact that Congress required 18-to-20-year-olds to muster for the militia cannot overcome the litany of historical analogues that are relevantly similar to the Marjory Stoneman Douglas High School Public Safety Act.

## III.

Unfortunately, firearm violence among some 18-to-20-year-olds is nothing new.  Tragically, all that has changed since the Reconstruction Era is the amount of carnage a single person can inflict in a short period because of the advances made in firearm technology over the last 150, or so, years.

But "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35).  And as our history shows, the states have never been without power to regulate 18-to-20-year-olds' access to firearms.  Going back to the Reconstruction Era, that is exactly what many states around the country did.  Indeed, many states, when the Fourteenth Amendment was ratified, banned 18-to-20-year-olds from buying and sometimes even possessing firearms.  And they did so to address the public-safety problem some 18-to-20-year-olds with firearms have long represented.

Florida enacted the Marjory Stoneman Douglas High School Public Safety Act—as its name indicates—for precisely the same reason as states in the Reconstruction Era adopted their firearm restrictions for 18-to-20-year-olds—to address the public-safety crisis some 18-to-20-year-olds with firearms represent. Because Florida's Act is at least as modest as the firearm prohibitions on 18-to-20-year-olds in the Reconstruction Era and enacted for the same reason as those laws, it is "relevantly similar" to those Reconstruction Era laws. *Bruen*, 142 S. Ct. at 2132. And as a result, it does not violate the Second Amendment.

We therefore affirm the district court's order granting summary judgment in Florida's favor.

**AFFIRMED.**

34                    Opinion of the Court                    21-12314

## Appendix

| Appendix 1: Reconstruction Era Laws Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically) | |
|---|---|
| **State** | **Citation(s)** |
| Alabama | 1855 Ala. Laws 17 (making it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol"); *see also Brown v. Beason*, 24 Ala. 466, 466 (1854) (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing "a minor under the age of twenty-one years"); *Vincent v. Rogers*, 30 Ala. 471, 473–74 (1857) (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract). |
| Tennessee | TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (making it unlawful to sell, loan, or give, "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling"); *see also Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660–61 (1858) (referring to |

| | |
|---|---|
| | twenty-one as the age of majority); *Seay v. Bacon*, 36 Tenn. (4 Sneed) 99, 102 (1856) (same). |
| Kentucky | 1859 Ky. Acts 245, § 32 (making it unlawful for anyone, "other than the guardian," to "sell, give, or loan any pistol, dirk, bowie-knife, brass-knucks, slung-shot, cold, cane-gun, or other deadly weapon . . . to any minor"); *see also, e.g.*, *Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666, 671 (1857) (referring to twenty-one as the age of majority). |
| Indiana | 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon"). |
| Georgia | 1876 Ga. Laws 112 (making it unlawful "to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane"); *see also* *McDowell v. Georgia R.R*, 60 Ga. 320, 321 (1878) (noting that "age of legal majority" in Georgia was "twenty-one years; until that age all persons [were] minors"). |
| Mississippi | 1878 Miss. Laws 175 (making it unlawful "for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any" "bowie knife, pistol, brass knuckles, slung shot, or other deadly weapon of like kind or description); *see also Rohrbacher v. City of Jackson*, 51 Miss. 735, 744 , 746 (1875) (observing that a provision, which authorized "female citizens over eighteen years of age" to vote, "authoriz[d] females, |

| | |
|---|---|
| | some of whom are minors, to have a voice in the election"); *Acker v. Trueland*, 56 Miss. 30, 34 (1878) (providing an exception for widows and children "until the youngest child shall be twenty-one years of age"). |
| Missouri | MO. REV. STAT. § 1274 (1879), *reprinted in* 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879) (making it unlawful to "sell or deliver, loan or barter to any minor" "any deadly or dangerous weapon" "without the consent of the parent or guardian of such minor"); *see also id.* § 2559 (setting the age of majority at twenty-one for males and eighteen for females). |
| Illinois | 1881 Ill. Laws 73 (making it unlawful for anyone other than a minor's father, guardian, or employer to "sell, give, loan, hire or barter," or to "offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character"); *see also* ch. no. 64 ILL. COMP. STAT. § 1 (1881) (setting the age of majority at twenty-one for males and eighteen for females). |
| Nevada | NEV. REV. STAT. § 4864 (1885) (making it unlawful for anyone "under the age of twenty-one (21) years" to "wear or carry any pistol, sword in case, slung shot, or other dangerous or deadly weapon"). |
| Delaware | 16 Del. Laws 716 (1881) (making it unlawful to "knowingly sell a deadly weapon to a minor other than an ordinary pocket knife"); *see also* Revised Statutes of the State of Delaware 60 (The |

|  | Mercantile Printing Co. ed. 1893) (setting the age of Majority at twenty-one for males and eighteen for females); Revised Statutes of the State of Delaware 484–85 (James & Webb ed. 1874) (same). |
| --- | --- |
| Maryland | 1882 Md. Laws 656 (making it "unlawful for any person . . . to sell, barter, or give away any firearm whatsoever or other deadly weapon, except for shot gun, fowling pieces and rifles to any person who is a minor under the age of twenty-one years."). |
| West Virginia | 1882 W. Va. Acts 421 (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character" "to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years"). |
| Kansas | 1883 Kan. Sess. Laws 159 (making it unlawful to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol . . . or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapon[] to any minor"); *see also Burgett v. Narrick*, 25 Kan. 526, 527–28 (Kan. 1881) (referring to twenty-one as the age of majority) |
| Wisconsin | 1883 Wis. Sess. Laws 290 (vol. 1) (making it "unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state"); *see also Hepp v.* |

| | |
|---|---|
| | *Huefner*, 20 N.W. 923, 924 (Wis. 1884) (referring to twenty-one as the age of majority) |
| Iowa | 1884 Iowa Acts 86 (making it "unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor"); *see also In re Mells*, 20 N.W. 486 (Iowa 1884) (referring to twenty-one as the age of majority); *Hoover v. Kinsey Plow Co.*, 8 N.W. 658 (Iowa 1881) (referring to twenty-one as the age of majority). |
| Louisiana | 1890 La. Acts 39 (making it unlawful "for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years"). |
| Wyoming | 1890 Wyo. Terr. Sess. Laws 140 (making it "unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person"); *see also* Revised Statutes of Wyoming 1253 (J.A. Van Orsdel & Fenimore Chatterton eds. 1899) (codifying the same). |
| District of Columbia | 27 Stat. 116–17 (1892) (making it unlawful to "sell, barter, hire, lend or give to any minor under the age of twenty-one years" "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles"). |

21-12314          Opinion of the Court          39

| | |
|---|---|
| North Carolina | 1893 N.C. Sess. Laws 468 (making it "unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot"); *see also State v. Kittelle*, 15 S.E. 103, 103–04 (N.C. 1892) (referring to twenty-one as the age of majority). |
| Texas | 1897 Tex. Gen. Laws 221–22 (making it unlawful to "knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof"); *see also* 2 Sayles' Annotated Civil Statutes of the State of Texas 1009 (John Sayles & Henry Sayles eds. 1898) (setting the age of majority at twenty-one for males and unmarried females). |

21-12314                 WILSON, J., Concurring                 1

WILSON, Circuit Judge, concurring in the judgment:

I would wait to issue an opinion until the current session of the Florida legislature completes its consideration of H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023), which may render the issue moot. If passed, H.B. 1543 would reduce the minimum age in the law at issue from 21 to 18. However, I concur in the judgment given the law as it exists today.

An official website of the United States government Here's how you know

# Age and Sex Composition in the United States: 2021

2021

## Detailed Tables by Age and Sex

- **Table 1. Population by Age and Sex: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table1.xlsx]

- **Table 2. Marital Status of the Population 15 Years and Over by Sex and Age: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table2.xlsx]

- **Table 3. Educational Attainment of the Population 15 Years and Over by Sex and Age: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table3.xlsx]

- **Table 4. Nativity and Citizenship Status by Sex and Age: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table4.xlsx]

- **Table 5. Year of Entry of the Foreign-Born Population by Sex and Age: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table5.xlsx]

- **Table 6. Households by Type and Age of Householder: 2021 [<1.0 MB]** [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table6.xlsx]

| | | **Related Information** |
|---|---|---|
| **Table 7. Labor Force and Employment Status of the Civilian Population 16 Years and Over by Sex and Age: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table7.xlsx] | TABLE Age and Sex Tables [/topics/population/age-and-sex/data/tables.html] |
| **Table 8. Occupation of the Civilian Employed Population 16 Years and Over by Sex: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table8.xlsx] | |
| **Table 9. Earnings of Full-Time, Year-Round Workers 15 Years and Over by Sex and Age: 2020 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table9.xlsx] | |
| **Table 10. Total Money Income of Households by Type and Age of Householder: 2020 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table10.xlsx] | |
| **Table 11. Poverty Status of the Population by Sex and Age: 2020 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table11.xlsx] | |
| **Table 12. Age Distribution of the Population by Sex and Generation: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table12.xlsx] | |
| **Table 13. Generational Distribution of the Population by Sex and Age: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table13.xlsx] | |
| **Table 14. Health Insurance Status by Sex and Age: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table14.xlsx] | |
| **Table 15. Households by Couple Type and Age of Householder: 2021 [<1.0 MB]** | [//www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/2021agesex_table15.xlsx] | |

# Additional File Formats

Other file formats are available on the FTP archive.

[/www2.census.gov/programs-surveys/demo/tables/age-and-sex/2021/age-sex-composition/]

Page Last Revised - October 20, 2022

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Table 38



Criminal Justice Information Services Division | Feedback | Contact Us | Data Quality Guidelines | UCR Home

**Home**   **Offenses Known to Law Enforcement**   **Violent Crime**   **Property Crime**   **Clearances**   **Persons Arrested**   **Police Employee Data**

Table 38

**Arrests**
by Age, 2019
[10,831 agencies; 2019 estimated population 229,735,355]

Overview   Data Declaration   Download Excel

| Offense charged | Total all ages | Ages under 15 | Ages under 18 | Ages 18 and over | Under 10 | 10-12 | 13-14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 6,917,552 | 156,886 | 485,964 | 6,431,588 | 2,550 | 36,691 | 117,645 | 94,426 | 108,807 | 125,845 | 170,444 | 192,362 | 192,045 | 198,861 | 201 |
| Total percent distribution[1] | 100.0 | 2.3 | 7.0 | 93.0 | * | 0.5 | 1.7 | 1.4 | 1.6 | 1.8 | 2.5 | 2.8 | 2.8 | 2.9 | |
| Murder and nonnegligent manslaughter | 7,711 | 74 | 601 | 7,110 | 0 | 11 | 63 | 107 | 165 | 255 | 400 | 413 | 389 | 370 | |
| Rape[2] | 16,966 | 1,264 | 2,887 | 14,079 | 31 | 357 | 876 | 499 | 516 | 608 | 748 | 579 | 591 | 523 | |
| Robbery | 56,854 | 2,665 | 12,266 | 44,588 | 8 | 333 | 2,324 | 2,692 | 3,312 | 3,597 | 3,797 | 3,172 | 2,520 | 2,245 | 2 |
| Aggravated assault | 277,561 | 6,867 | 19,499 | 258,062 | 138 | 1,864 | 4,865 | 3,723 | 4,185 | 4,724 | 5,825 | 6,592 | 7,043 | 7,931 | 8 |
| Burglary | 120,242 | 4,806 | 14,504 | 105,738 | 88 | 1,024 | 3,694 | 3,089 | 3,286 | 3,323 | 3,953 | 3,872 | 3,310 | 3,283 | |
| Larceny-theft | 604,287 | 18,480 | 62,200 | 542,087 | 231 | 3,754 | 14,495 | 12,482 | 14,536 | 16,702 | 20,361 | 19,232 | 17,194 | 16,399 | 15 |
| Motor vehicle theft | 57,738 | 2,626 | 9,742 | 47,996 | 4 | 260 | 2,362 | 2,442 | 2,450 | 2,224 | 2,010 | 1,793 | 1,653 | 1,630 | 1 |
| Arson | 6,369 | 717 | 1,284 | 5,105 | 50 | 247 | 420 | 210 | 177 | 160 | 146 | 122 | 105 | 122 | |
| Violent crime[3] | 359,092 | 10,870 | 35,253 | 323,839 | 177 | 2,565 | 8,128 | 7,021 | 8,178 | 9,184 | 10,770 | 10,756 | 10,593 | 11,069 | 10 |
| Violent crime percent distribution[1] | 100.0 | 3.0 | 9.8 | 90.2 | * | 0.7 | 2.3 | 2.0 | 2.3 | 2.6 | 3.0 | 3.0 | 2.9 | 3.1 | |
| Property crime[3] | 788,636 | 26,629 | 87,730 | 700,926 | 373 | 5,285 | 20,971 | 18,223 | 20,449 | 22,409 | 26,470 | 25,019 | 22,262 | 21,432 | 20 |
| Property crime percent distribution[1] | 100.0 | 3.4 | 11.1 | 88.9 | * | 0.7 | 2.7 | 2.3 | 2.6 | 2.8 | 3.4 | 3.2 | 2.8 | 2.7 | |
| Other assaults | 717,793 | 38,619 | 88,269 | 629,524 | 736 | 11,229 | 26,654 | 16,913 | 15,919 | 14,660 | 16,145 | 16,496 | 19,478 | 19 | |
| Forgery and counterfeiting | 32,495 | 98 | 611 | 31,884 | 2 | 23 | 73 | 149 | 221 | 747 | 1,177 | 1,269 | 906 | | |
| Fraud | 79,954 | 645 | 2,620 | 77,334 | 2 | 108 | 535 | 464 | 661 | 850 | 1,502 | 2,009 | 2,286 | 2,129 | 2 |
| Embezzlement | 10,003 | 25 | 400 | 9,603 | 0 | 5 | 20 | 36 | 117 | 232 | 431 | 545 | 470 | 388 | |
| Stolen property; buying, receiving, possessing | 64,027 | 1,368 | 6,487 | 57,540 | 2 | 118 | 1,248 | 1,358 | 1,732 | 2,029 | 2,314 | 2,231 | 2,053 | 1,905 | 1 |
| Vandalism | 128,474 | 9,891 | 22,744 | 105,730 | 314 | 2,926 | 6,651 | 4,247 | 4,355 | 4,251 | 4,316 | 4,161 | 3,920 | 3,994 | 3 |
| Weapons; carrying, possessing, etc. | 110,130 | 3,347 | 11,563 | 98,567 | 63 | 863 | 2,421 | 2,092 | 2,705 | 3,419 | 4,186 | 4,342 | 4,232 | 4,308 | 4 |
| Prostitution and commercialized vice | 20,015 | 30 | 214 | 19,801 | 0 | 8 | 22 | 26 | 55 | 103 | 477 | 818 | 881 | 893 | |
| Sex offenses (except rape and prostitution) | 28,973 | 2,310 | 4,739 | 24,234 | 40 | 619 | 1,651 | 859 | 775 | 795 | 828 | 700 | 624 | 601 | |
| Drug abuse violations | 1,067,764 | 10,881 | 55,701 | 1,012,063 | 55 | 1,695 | 9,131 | 9,689 | 13,996 | 21,135 | 36,298 | 41,116 | 38,389 | 37,432 | 36 |
| Gambling | 1,909 | 26 | 150 | 1,759 | 1 | 3 | 22 | 29 | 45 | 50 | 32 | 67 | 55 | 36 | |
| Offenses against the family and children | 58,720 | 772 | 2,098 | 56,622 | 27 | 188 | 557 | 434 | 458 | 434 | 635 | 741 | 825 | 1,039 | 1 |
| Driving under the influence | 658,902 | 89 | 3,580 | 655,322 | 5 | 13 | 71 | 161 | 858 | 2,472 | 7,152 | 11,113 | 12,995 | 20,860 | 22 |
| Liquor laws | 112,467 | 2,681 | 17,072 | 95,395 | 6 | 379 | 2,296 | 2,738 | 4,508 | 7,145 | 14,821 | 15,621 | 13,296 | 2,745 | 2 |
| Drunkenness | 219,696 | 372 | 2,414 | 217,282 | 5 | 52 | 315 | 362 | 576 | 1,104 | 3,032 | 3,735 | 3,972 | 6,276 | 6 |
| Disorderly conduct | 211,960 | 16,045 | 36,877 | 175,083 | 224 | 4,335 | 11,486 | 7,733 | 7,029 | 6,070 | 5,379 | 5,212 | 5,439 | 6,489 | 6 |
| Vagrancy | 16,104 | 77 | 255 | 15,849 | 3 | 15 | 59 | 62 | 60 | 56 | 245 | 216 | 306 | 218 | |
| All other offenses (except traffic) | 2,219,328 | 28,480 | 96,409 | 2,122,919 | 497 | 5,684 | 22,299 | 19,448 | 22,558 | 25,923 | 36,139 | 46,633 | 51,696 | 56,651 | 59 |
| Suspicion | 329 | 7 | 17 | 312 | 0 | 0 | 7 | 1 | 4 | 5 | 10 | 5 | 6 | 12 | |
| Curfew and loitering law violations | 10,781 | 3,624 | 10,781 | - | 18 | 578 | 3,028 | 2,447 | 2,721 | 1,989 | - | - | - | - | |

- [1] Because of rounding, the percentages may not add to 100.0.
- [2] The rape figures in this table are aggregate totals of the data submitted based on both the legacy and revised Uniform Crime Reporting definitions.
- [3] Violent crimes are offenses of murder and nonnegligent manslaughter, rape, robbery, and aggravated assault. Property crimes are offenses of burglary, larceny-theft, motor vehicle theft, and arson.
- * Less than one-tenth of 1 percent.

### Overview

Download Printable Document

**Arrests, by Age, 2019**

- In 2019, 93.0 percent of all individuals arrested were adults (18 years of age and over). Adults comprised 90.2 percent of all persons arrested for violent crimes and 88.9 percent of persons arrested for property crimes.
- Adults accounted for 94.8 percent of persons arrested for drug abuse violations.
- In 2019, 19.8 percent of persons arrested for arson were juveniles. More than half of those juveniles (56.7 percent) were under the age of 15.
- Persons between the ages of 25 and 29 accounted for 16.8 percent of all arrestees in 2019.

| Most Wanted | News | What We Investigate | Services | Additional Resources |
|---|---|---|---|---|
| Ten Most Wanted | Stories | Terrorism | CJIS | Accessibility |
| Fugitives | Videos | Counterintelligence | CIRG | eRulemaking |
| Terrorism | Press Release | Cyber Crime | Laboratory Services | Freedom of Information / Privacy Act |
| Kidnappings / Missing Persons | Speeches | Public Corruption | Training Academy | Legal Notices |
| Seeking Information | Testimony | Civil Rights | Operational Technology | Legal Policies & Disclaimers |
| Bank Robbers | Podcasts and Radio | Organized Crime | Information Management | Privacy Policy |
| ECAP | Photos | White-Collar Crime | | USA.gov |
| ViCAP | Español | Violent Crime | **FBI Jobs** | White House |
| | Apps | WMD | Submit a Tip | No FEAR Act |
| **About** | | | Crime Statistics | Equal Opportunity |
| Mission & Priorities | **Resources** | **Contact Us** | History | |
| Leadership & Structure | Law Enforcement | Field Offices | FOIPA | |
| Partnerships | Businesses | FBI Headquarters | Scams & Safety | |
| Community Outreach | Victim Assistance | Overseas Offices | FBI Kids | |
| FAQs | Reports & Publications | | FBI Tour | |



## FBI
# FEDERAL BUREAU
# OF INVESTIGATION



**FBI.gov Contact Center**
Email updates



(86)

of a fellow student – If he shall go more than two miles from Athens without leave from the president a professor a tutor. If he shall disturb others by noise loud talking or singing during the time of study – if he shall ring the Bell without order or permission – if he shall play at Billiards, Cards, or any unlawful game, if he shall associate with vile idle or dissolute persons, or shall admit them into his chamber – if he shall instigate or advise any student to a refractory or stubborn behaviour he shall for either of those offences be punished by admonition, rustication or expulsion as the nature and circumstances of the case may require And be it further ordained that no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever.

That the third section of the fourth chapter be altered and amended to read as follows, to wit,

The established course of study in the College shall be as follows – to wit, the first or Freshman Class, shall study the French language, Cicero's Orations, Greek Testament, Arithmetic – Bookkeeping and practice eloqution. The second class shall read Horace, Homers Iliad, Algebra, Geometry – Mensuration of superfices & solids the ascertaining of heights and distances, conic sections Plane and Spherical Trigonometry – navigation surveying – Geography – Compostion, English Grammar practice public speaking and also study the French language But the french languages mat be studied by any person not a Member of the College or of the grammar school on paying the same for tuition that is paid in College. And children from the Grammar

(87)

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# The Origin of Toy Guns in America

By Catie Carberry (https://firearmslaw.duke.edu/author/cmc176duke-edu/) on July 18, 2019 Categories: History (https://firearmslaw.duke.edu/history/), Scholarship (https://firearmslaw.duke.edu/scholarship/), Second Amendment (https://firearmslaw.duke.edu/secondamendment/)

In *The Gunning of America* (https://www.amazon.com/Gunning-America-Business-American-Culture/dp/0465048951), Pamela Haag challenged the idea that "guns are part of the American identity," and argued that in the United States, "the gun culture was forged in the image of commerce. . . it was etched strongly by the character, ambition, and will of gun capitalists rather than by diplomats, politicians, generals, and statesmen."

I have found some foundation for that argument in the realm of toy gun laws on the Repository of Historical Gun Laws (https://law.duke.edu/gunlaws/). Before continuing, it is worth noting what the term "toy gun" refers to in the nineteenth and early twentieth century context. An Ohio (https://law.duke.edu/gunlaws/1883/ohio/467976/) statute from 1883 defined toy pistols as "pistol[s] manufactured out of any metallic or hard substance." According to a Pennsylvania (https://law.duke.edu/gunlaws/1883/pennsylvania/468662/) statute from 1883, toy (or imitation guns) were "arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged." These definitions, which could just as easily define guns, suggest that states initially struggled to differentiate between toy guns and real guns. Despite these ambiguities, we can at the very least infer that the toy firearms referred to in these laws are far more sophisticated than the plastic gun you might be imagining. In fact, articles (http://www.cnn.com/2003/LAW/01/08/ctv.toy.guns/) that discuss toy arms from the 1800s include in their discussion cap guns (https://vintagetoycapguns.com/cast-iron-cap-guns) and BB guns (https://www.pyramydair.com/blog/2015/08/the-rise-of-the-bb-gun-part-1/).

I began researching toy guns with the hope that there would be a connection to the current debate on 3D printing firearms (see here (https://www.leagle.com/decision/infco20160920090) and here (https://www.thefederalistpapers.org/wp-content/uploads/2014/09/SSRN-id2450663.pdf)), such as a lack of regulation and traceability. Unfortunately, that connection is not apparent, at least not at the moment. What I have seen instead is a more general reaction to toy guns as a mechanism for causing harm distinct from other firearms. This was in part because toy guns were marketed for children, as lamented by the New York Times (https://www.nytimes.com/1875/04/20/archives/toy-pistols.html) in 1875 and the Baltimore Sun (https://baltimoresun.newspapers.com/image/372401406/?terms=%22Toy%2BPistols%2Band%2BConcealed%2BWeapons) in 1881. Considering this fear, it is unsurprising that there are many laws throughout the late 1800s and early 1900s, including out of Ohio (https://law.duke.edu/gunlaws/1883/ohio/467976/) (1883), Kansas (https://law.duke.edu/gunlaws/1883/kansas/467613/) (1883), New Hampshire (https://law.duke.edu/gunlaws/?search=&jurisdiction%5B%5D=39933&year%5Bmin%5D%5Bdate%5D=1883&year%5Bmax%5D%5Bdate%5D=1883) (1883), Pennsylvania (https://law.duke.edu/gunlaws/1883/pennsylvania/468662/) (1883), Washington (https://law.duke.edu/gunlaws/1883/washington/468665/) (1883), Iowa (https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssia0095&id=114&men_tab=srchresults) (1884), New Jersey (https://law.duke.edu/gunlaws/1885/new-jersey/467858/) (1885), New Orleans (https://law.duke.edu/gunlaws/1893/louisiana/468652/) (1893), and Virginia (https://law.duke.edu/gunlaws/1903/virginia/468204/) (1903), that limited the sale and possession of toy guns and pistols to minors.  What *is* surprising, though, is that there were also many toy firearms laws that targeted adults, including legislation out of Baltimore (https://law.duke.edu/gunlaws/1881/maryland/468431/) (1881), Wisconsin (https://law.duke.edu/gunlaws/1882/wisconsin/468666/) (1882), Maine (https://law.duke.edu/gunlaws/1883/maine/468430/) (1883), Utah (https://law.duke.edu/gunlaws/1884/utah/468441/) (1884), Indiana (https://law.duke.edu/gunlaws/1885/indiana/468428/) (1885), and Arkansas (https://law.duke.edu/gunlaws/1909/arkansas/467383/) (1909). Wisconsin's statute is pretty representative of these laws, and it made it "unlawful for any person to sell or use, or have in his possession, for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy fire-arm." These states went beyond keeping toy arms out of the hands of children, which suggests that toy firearms posed a risk in addition to being attractive to children. And notably, some of these states, such as Mississippi (https://law.duke.edu/gunlaws/1892/mississippi/468435/) (1892) and Tennessee (https://law.duke.edu/gunlaws/1895/tennessee/468120/) (1895), had a constitutionally protected right to arms (see here (https://law.duke.edu/gunlaws/1890/mississippi/467761/) and here (https://law.duke.edu/gunlaws/1870/tennessee/468113/)).

Now to return to Haag. According to CNN in an article (http://www.cnn.com/2003/LAW/01/08/ctv.toy.guns/) from 2003, modern toy guns, beginning with the cap gun, were invented following the Civil War and they were produced by the same factories that produced standard firearms. Given these facts, Collectors Weekly (https://www.collectorsweekly.com/), an online resource that sells antique toy guns, claims that modern toy guns were produced in an effort by gun factories to stay in business (https://www.collectorsweekly.com/toys/cap-guns) after demand dropped at the conclusion of the Civil War. Others (https://vintagetoycapguns.com/cast-iron-cap-guns) have similarly made this claim, and CNN (http://www.cnn.com/2003/LAW/01/08/ctv.toy.guns/) insinuates as much ("[T]he modern history begins with the cap gun, invented by shotgun manufacturers who retrofitted their factories in the settling smoke of the Civil War").

If modern toy firearms were in fact produced "as a pretext for real guns" — or to "claim the economies of scale" on the cheaper ammunition, and will of gun capitalists" rings true, at least in relation to toy guns.  According to the Repository, "diplomats, politicians, generals, and statesmen" did not begin to regulate toy guns and thereby make their mark until the 1880s (https://law.duke.edu/gunlaws/?search=toy&year%5Bmin%5D%5Bdate%5D=&year%5Bmax%5D%5Bdate%5D=).  As such, toy gun culture seems to have been "forged in the image of commerce."

At the very least, the Repository suggests that regulations of toy arms began much earlier than other sources suggest. Several sources, such as the Roanoke Times (https://www.roanoke.com/webmin/features/toy-guns-and-the-little-bang-theory-of-violence/article_d0d1f50e-cfb9-5164-8a63-dbf1c93ff4e8.html) and *The Cute and the Cool: Wondrous Innocence and Modern American Children's Culture* (https://books.google.com/books?id=JtPGl6JPZsgC&pg=PA167&lpg=PA167&dq=Rose+Simone+chicago+toy+gun&source=bl&ots=89VuEcdoe7&sig=ACfU3U2EQzUWa4NPB6W0nqWdTWout7arVw&hl=en&sa= cite Rose Simone's toy gun burning in Chicago in 1935 as the first example of resistance to toy guns. The Washington Post (https://www.washingtonpost.com/lifestyle/style/bang-the-troubled-legacy-of-toy-guns/2014/12/22/96494ea8-86f8-11e4-9534-f79a23c40e6c_story.html? utm_term=.d27ee0daf7b5) (2014) similarly describes the early 1900s "the golden years" for toy guns, and suggests that now "[t]hings have changed in the toy gun world . . . [because] attitudes about parenting and children and play have shifted markedly." The Repository suggests that attitudes have not changed so much as they have reverted back to the old normal, where strict regulation of toy firearms was commonplace.

Yet the Repository leaves many questions unanswered. Why did states strictly regulate toy firearms in the late 1800s? In particular, why did some states seemingly regulate toy firearms more rigorously than they did real firearms? Was it because of a risk that no longer applies, such as a hazardous component part (https://law.duke.edu/gunlaws/1893/iowa/468429/)? Or were they regulated for the same reasons they are now (https://papers.ssrn.com/sol3/papers.cfm? abstract_id=2535438)? And finally, the age-old question remains: will you in fact shoot your eye out (https://www.youtube.com/watch?v=Nv7S-nwm2O8)? The world may never know.

**[Ed. Note: This post about gun laws in the Center's Repository of Historical Gun Laws is written by Center research assistant Catie Carberry. This post, like the Repository, is exemplary and not exhaustive.]**

## Search the Blog

Enter keyword(s)

Go

## Center Bloggers

- Jacob Charles (https://firearmslaw.duke.edu/author/jdc52duke-edu/)
- Andrew Willinger (https://firearmslaw.duke.edu/author/amw79duke-edu/)
- Joseph Blocher (https://firearmslaw.duke.edu/author/eb116duke-edu/)
- Darrell Miller (https://firearmslaw.duke.edu/author/dam53duke-edu/)

## Guest Contributors

- Dru Stevenson (https://firearmslaw.duke.edu/author/drustevenson/)
- Duke Center for Firearms Law (https://firearmslaw.duke.edu/author/dukecenterforfirearmslaw/)
- Catie Carberry (https://firearmslaw.duke.edu/author/cmc176duke-edu/)
- Patrick J. Charles (https://firearmslaw.duke.edu/author/patrickcharles/)
- Saul Cornell (https://firearmslaw.duke.edu/author/saulcornell/)
- Robert Leider (https://firearmslaw.duke.edu/author/robleider/)
- Genesa Cefali (https://firearmslaw.duke.edu/author/gcc10duke-edu/)
- Eric Ruben (https://firearmslaw.duke.edu/author/eruben/)
- Alexys Ogorek (https://firearmslaw.duke.edu/author/aogorek/)
- Cody Jacobs (https://firearmslaw.duke.edu/author/codyjacobs/)
- Rafi Reznik (https://firearmslaw.duke.edu/author/rreznik/)
- E. Gregory Wallace (https://firearmslaw.duke.edu/author/gwallace/)
- Pratheepan Gulasekaram (https://firearmslaw.duke.edu/author/gulasekaram/)
- Lindsay Schakenbach Regele (https://firearmslaw.duke.edu/author/lindsayschakenbachregele/)
- Bernard Bell (https://firearmslaw.duke.edu/author/bbell/)
- Alex Hansen (https://firearmslaw.duke.edu/author/ahansen/)
- Justin Van Orsdol (https://firearmslaw.duke.edu/author/justinvanorsdol/)
- Sam Wolter (https://firearmslaw.duke.edu/author/swolter/)
- Daniel Rice (https://firearmslaw.duke.edu/author/drice/)
- Brennan Gardner Rivas (https://firearmslaw.duke.edu/author/bgr/)
- Nicholas Mosvick (https://firearmslaw.duke.edu/author/nicholasmosvick/)
- Kevin Tobia (https://firearmslaw.duke.edu/author/ktobia/)
- Khoa Nguyen (https://firearmslaw.duke.edu/author/knguyen/)
- Ken Stahl (https://firearmslaw.duke.edu/author/kenstahl/)
- Lily Tran (https://firearmslaw.duke.edu/author/ltran/)
- Ilya Somin (https://firearmslaw.duke.edu/author/ilso/)
- Anya Bernstein (https://firearmslaw.duke.edu/author/abernstein/)
- Peter Salib (https://firearmslaw.duke.edu/author/psalib/)
- Rich Schragger (https://firearmslaw.duke.edu/author/richschragger/)
- Zane Martin (https://firearmslaw.duke.edu/author/zmartin/)
- Timothy Hsiao (https://firearmslaw.duke.edu/author/thsiao/)
- Lars Noah (https://firearmslaw.duke.edu/author/lnoah/)
- Stephen Mouritsen (https://firearmslaw.duke.edu/author/smouritsen/)
- K. Alexander Adams (https://firearmslaw.duke.edu/author/aadams/)
- Rick Su (https://firearmslaw.duke.edu/author/ricksu/)
- Jonah Skolnik (https://firearmslaw.duke.edu/author/jskolnik/)

- Kate Shaw (https://firearmslaw.duke.edu/author/kateshaw/)
- Michael Ulrich (https://firearmslaw.duke.edu/author/mulrich/)
- Jonathan E. Lowy (https://firearmslaw.duke.edu/author/jel/)
- Robert J. Spitzer (https://firearmslaw.duke.edu/author/spitzer/)
- William Baude (https://firearmslaw.duke.edu/author/wbaude/)
- E.J. Morera (https://firearmslaw.duke.edu/author/emorera/)
- Sarah Swan (https://firearmslaw.duke.edu/author/sarahswan/)
- Daniel Harawa (https://firearmslaw.duke.edu/author/dh/)
- Laura Beth Nielsen (https://firearmslaw.duke.edu/author/laurabethnielsen/)
- Heidi Li Feldman (https://firearmslaw.duke.edu/author/hfeld/)
- Connie Hassett-Walker (https://firearmslaw.duke.edu/author/conniehassettwalker/)
- Dennis Baron (https://firearmslaw.duke.edu/author/dbaron/)
- Casey Lessard (https://firearmslaw.duke.edu/author/clessard/)
- Shawn Fields (https://firearmslaw.duke.edu/author/shawnfields/)
- Margareth Etienne (https://firearmslaw.duke.edu/author/melaw/)
- Carl Bogus (https://firearmslaw.duke.edu/author/boguscarl/)
- Kat Albrecht (https://firearmslaw.duke.edu/author/kalbrecht/)
- Jody Lyneé Madeira (https://firearmslaw.duke.edu/author/jlm/)
- Melissa K. Merry (https://firearmslaw.duke.edu/author/melissamerry/)
- Neal Goldfarb (https://firearmslaw.duke.edu/author/ngoldfarb/)
- Joshua Aiken (https://firearmslaw.duke.edu/author/jaiken/)
- Richard Briffault (https://firearmslaw.duke.edu/author/richardbriffault/)
- Lindsay Livingston (https://firearmslaw.duke.edu/author/ll3/)
- Courtlyn Roser-Jones (https://firearmslaw.duke.edu/author/courtlynroserjones/)
- Shannon Brincat (https://firearmslaw.duke.edu/author/sbrincat/)
- Joseph Greenlee (https://firearmslaw.duke.edu/author/jgr/)
- Kari Sullivan (https://firearmslaw.duke.edu/author/ksullivan/)
- Sarah Lim (https://firearmslaw.duke.edu/author/slim/)
- Gregory Parks (https://firearmslaw.duke.edu/author/gsp/)
- Marla Spector Bowman (https://firearmslaw.duke.edu/author/mbowman/)
- Ian Ayres (https://firearmslaw.duke.edu/author/ia/)
- Dave Fagundes (https://firearmslaw.duke.edu/author/davefagundes/)
- Jeffrey Swanson (https://firearmslaw.duke.edu/author/jswanson/)
- Dave Kopel (https://firearmslaw.duke.edu/author/dkopel/)
- Jaclyn Schildkraut (https://firearmslaw.duke.edu/author/jschildkraut/)
- Angela Riley (https://firearmslaw.duke.edu/author/arr/)
- Jennifer Carlson (https://firearmslaw.duke.edu/author/jennifercarlson/)
- Carina Bentata Gryting (https://firearmslaw.duke.edu/author/cbg/)
- Eric J. Segall (https://firearmslaw.duke.edu/author/ericsegall/)

## Categories

Select Category ▼

## Subscribe to Second Thoughts

Receive email notifications when new posts are written.

**Your email:**

Enter email address...

Subscribe   Unsubscribe

## Archives

Select Month ▼

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2023. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

WP Twitter Auto Publish (https://xyzscripts.com/wordpress-plugins/twitter-auto-publish/compare) Powered By : XYZScripts.com (http://www.xyzscripts.com)



Encyclopedia Virginia
VIRGINIA HUMANITIES

PRIMARY DOCUMENT

# University of Virginia Board of Visitors Minutes (October 4–5, 1824)

ORIGINAL IMAGES

    

[https://encyclopediavirginia.org/...]

    

[https://encyclopediavirginia.org/...]

[https://encyclopedia/virginia.org/entries/...0cc9556c71b1ca88/0a13b85e3400/1647cf50d672b0626c223bf0/1b4104a813/]

## CONTEXT

At its meeting of October 4–5, 1824, the University of Virginia board of visitors discusses a number of issues, including what professors to hire and the regulations that would govern student life at the new university, including right of students to bring **personal slaves** [https://encyclopediavirginia.org/entries/slavery-at-the-university-of-virginia/] onto Grounds.

*Author:* **University of Virginia Board of Visitors**

*Transcription Source:* University of Virginia Board of Visitors Minutes, October 4–5, 1824, Thomas Jefferson Papers, Albert and Shirley Small Special Collections Library, University of Virginia.

## FULL TEXT

At a meeting of the Visitors of the University, at the University on Monday the 4th. of October 1824. at which were present **Thomas Jefferson** [https://encyclopediavirginia.org/entries/jefferson-thomas-1743-1826/], **James Madison** [https://encyclopediavirginia.org/entries/madison-james-1751-1836/], **James Breckenridge** [https://encyclopediavirginia.org/entries/breckinridge-james-1763-1833/], **John H. Cocke** [https://encyclopediavirginia.org/entries/cocke-john-hartwell-

1780–1866/], George Loyall

and **Joseph C. Cabell**



University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 1

[https://encyclopediavirginia.org/entries/cabell-joseph-c-1778-1856/].

Resolved that the board ratify two purchases of land in front of the

**Rotunda** [https://encyclopediavirginia.org/entries/university-of-virginia-

the-architecture-of-the/] purchased of Daniel A. Piper, and Mary A. F. his wife.

Resolved that permission be given to Francis W. Gilmer, now on

his mission to Great Britain for the purpose of engaging Professors for

the University, to use for his expences six or seven hundred dollars of

the 6000.D. put into his hands for the purchase of books and apparatus.

Resolved that it is the opinion of the board that if the arrearages of subscription should not be sufficient to pay for the articles of marble contracted for in Italy, it will be proper to supply the deficiency from the annuity of the year 1825.

Resolved that the Bursar be authorised to enter into negociation with any one of the banks for the purpose of procuring an advance of the sperate part of the arrears of subscription, with an understanding that the University shall not be called on for the reimbursement of the monies till such time as they shall be paid by subscribers, or within  such other time as shall be reasonable.

Resolved that the rent for the hotels be fixed at 200.D. per annum.

The board then proceeding to consider of the regulations necessary for constituting, governing and conducting the Institution in addition to those passed at their last session, agreed to the following supplementory enactments.

Each of the schools of the University shall be held two hours of every other day of the week: and that every student may be enabled to attend those of his choice, let their sessions be so arranged, as to days and hours that no two

— page 2 —

of them shall be holden at the same time.  therefore

M. Tu. W. Th. F Sa. H H H 7−30 7−30 7−30 Antient languages 9−30 9−30 9−30

H H H 7−30 7−30 7−30 Modern languages 9−30 9−30 9−30 9−30 9−30 9−30

Mathematics. 11−30 11−30 11−30 9−

30 9−30 9−30 Natural Philosophy

11−30 11−30 11−30 11−30 11−30 11−

30 Natural History 1−30 1−30 1−30

11−30 11−30 11−30 Anatomy

Medecine 1−30 1−30 1−30 1−30 1−30

1−30 Moral Philosophy 3−30 3−30

3−30 1−30 1−30 1−30 Law 3−30 3−

30 3−30

> University of Virginia Board of Visitors
> Minutes (October 4—5, 1824), Page 2

The school of Antient languages shall occupy from H 7−30 to H 9−30

A.M on Mondays, Wednesdays and Fridays … … … …

That of Modern languages shall occupy the same hours on

Tuesdays, Thursdays and Saturdays.

That of Mathematics shall occupy from H 9−30 to H 11−30 A.M. on

Mondays, Wednesdays and Fridays

That of Natural Philosophy the same hours on Tuesdays, Thursdays,  and

Saturdays

That of Natural history shall occupy from H 11−30. AM. to H 1−30. P.M.  on

Mondays, Wednesdays, and Fridays.

That of Anatomy and Medicine the same hours on Tuesdays, Thursdays, and Saturdays.

That of Moral Philosophy shall occupy from H 1−30. to H 3−30. P.M. on Mondays, Wednesdays, and Fridays.

That of Law the same hours on Tuesdays, Thursdays, and Saturdays.

The Visitors of the University shall be free, severally or together, to attend occasionally any school, during it's session, as Inspectors and judges of the mode in which it is conducted.

Where the instruction is by lessons, and the class too numerous for a single instructor, Assistant tutors may be employed, to be chosen by the Professor, to have the use of two adjacent dormitories each, rent-free, and to divide with the Professor the tuition fees, as shall be agreed between them.

The Professors, tutors, and all officers of the University shall reside constantly in the apartments of the University, or of it's precincts, assigned to them.

At meetings of the Faculty of Professors, on matters within their functions, one of them shall preside, by rotation, for the term of one year each. a majority of the members shall make a Quorum for business. they may appoint a Secretary of their own body, or otherwise, who shall keep a journal of their proceedings, and lay the same before the board of Visitors at their first ensuing meeting, and whenever else required.

— page 3 —

The compensation to such
Secretary shall be 50.D. yearly,
payable from the funds of the
University.

Meetings of the Faculty may be
called by the presiding member
of the year, or by any three of the
Professors, to be held in an
apartment of the Rotunda, and the
object of the call shall be expressed
in the written notification to be

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 3

served by the Janitor. but, when assembled, other business also may be
transacted.

The Faculty may appoint a Janitor, who shall attend it's meetings, their
several schools while in session, and the meetings of the Visitors; and shall
perform necessary menial offices for them, for which he shall recieve 150.
Dollars yearly from the funds of the University, and be furnished with a lodging
room.

No student is to be recieved under 16. years of age, rigorously proved. None
to be admitted into the Mathematical school, or that of Natural philosophy,

who is not an adept in all the branches of numerical arithmetic; and none into the school of antient languages, unless qualified, in the judgment of the professor, to commence reading the higher Latin classics; nor to recieve instruction in Greek, unless qualified in the same degree in that language.

No one shall enter as a Student of the University, either at the beginning, or during the progress of the session, but as for the whole session, ending on the 15th day of December, and paying as for the whole.

The **Dormitories** [https://encyclopediavirginia.org/entries/dorm-life-an-excerpt-fromhistory-of-the-university-of-virginia-1819-1919by-philip-alexander-bruce-1920-1922/] shall be occupied by two Students each, and no more, at 15.D. yearly rent to be paid to the Proctor at or before the end of the session, one half by each occupant, or the whole by one, if there be only one. and every student, within the same term, shall pay to the Proctor, also, for the University, 15.D. annually for his participation in the use of the public apartments, during the session.

The Students shall be free to diet themselves in any of the Hotels of the University, at their choice, or elsewhere, other than in taverns, as shall suit themselves. but not more than 50. shall be allowed to diet at the same Hotel.

No keeper of any of the Hotels of the University shall require or recieve more than 100.D. for dieting any student and for performing the necessary

offices of his Dormitory, during the session of ten months and an half, nor

shall suffer ardent

— page 4 —

spirits or wine mixed

or unmixed, to be drank within his

tenement, on pain of an immediate

determination of his lease, and

removal by the Faculty; nor shall

any person boarding elsewhere than

with their parents, in any house,

and using wine or ardent spirits,

mixed or unmixed, within such

house, or it's tenement, or paying

> University of Virginia Board of Visitors
> Minutes (October 4—5, 1824), Page 4

more than 120 Dollars, for diet,

lodging, and other offices and accomodations of the house and tenement,

during a like term, be admitted to any school of the University.

Every student shall be free to attend the schools of his choice, and no other

than he chuses.

There shall be one vacation only in the year, and that shall be from the 15th.

day of December to the last day of January.

Examinations of the candidates for honorary distinctions shall be held in the presence of all the Professors and Students, in the week preceding the commencement of the vacation. at these examinations shall be given, to the highly meritorious only, and by the vote of a majority of the Professors, Diplomas, or premiums of Medals or books, to be provided by the University, to wit, Diplomas to those of the highest qualifications, medals of more or less value, to those of a 2$^d$. grade of acquisition, and books of more or less value to those of a 3$^d$. these Diplomas shall be of two degrees; the highest of Doctor,  the second of Graduate, and the Diploma of each shall express the particular school or schools in which the Candidate shall have been declared eminent, and shall be subscribed by the particular professors approving it. but no Diploma shall be given to any one who has not passed such an examination in the Latin language as shall have proved him able to read the highest classics in that language with ease, thorough understanding, and just quantity. and if he be also a proficient in the Greek, let that too be stated in his Diploma. the intention being that the reputation of the University shall not be committed but to  those who, to an eminence in some one or more of the sciences taught in it, and a proficiency in these languages which constitute the basis of good education, and are indispensable to fill up the character of a 'well educated man.'

— page 5 —

Punishments for major offences

shall be Expulsion, temporary

suspension, or Interdiction of

residence or appearance within the

precincts of the University. the Minor

punishments shall be

Restraint within those Precincts,

within their own chamber, or in diet;

Reproof, by a Professor privately, or

in presence of the school of the

offender, or of all the schools, a seat

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 5

of degradation in his schoolroom of longer or shorter duration, Removal to a

lower class, Dismission from the schoolroom for the day, imposition of a task,

and insubordination to these sentences shall be deemed & punished as

Contumacy.

Contumacy shall be liable to any of the minor punishments.

The Precincts of the University are to be understood as co-extensive with

the lot or parcel of it's own grounds on which it is situated.

The major punishments of expulsion from the University,

temporary suspension of attendance and presence there, or interdiction of

residence or appearance within it's precincts, shall be decreed by the

professors themselves. Minor cases may be referred to a board of six Censors, to be named by the Faculty, from among the most discreet of the Students, whose duty it shall be, sitting as a Board, to enquire into the facts, propose the minor punishment which they think proportioned to the offence, and to make report thereof to the Professors for their approbation, or their commutation of the penalty, if it be beyond the grade of the offence. these Censors shall hold their offices until the end of the session of their appointment, if not sooner revoked by the Faculty.

In attendance on school, inattention to the exercises prescribed, and misbehavior or indecorum in school shall be subject to any of the minor punishments; and the professor of the school may singly reprove, impose a task, or dismiss from the room for the day.

Habits of expence, of dissoluteness, dissipation, or of playing at games of chance, being obtructive to the acquisition of science by the student himself and injurious, by example to others, shall be subject, in the first instance, to admonition and reproof to the offender, and to communication & warning to the parent or guardian; and, if not  satisfactorily corrected, to a refusal of further continuance at the University.

— page 6 —

No Student shall make any festive entertainment within the precincts of the University, nor contribute to, or be present at them there or elsewhere, but

with the consent of each of the

Professors whose school he attends,

on pain of a minor punishment.

No Student shall admit any

disturbing noises in his room, or

make them any where within the

precincts of the University, or fire a

gun or pistol within the same, on

pain of such minor sentence as the

faculty shall decree or approve. but

the proper use of musical

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 6

instruments, shall be allowed in their rooms, and in that appropriated for

instruction in music.

Riotous, disorderly, intemperate or indecent conduct of any student within

the precincts shall be punished by interdiction of a residence within the

precincts; and repetitions of such offences, by expulsion from the University.

Fighting with weapons which may inflict death, or a challenge to such

fight, given or accepted, shall be punished by instant expulsion from the

University, not remissible by the Faculty; and it shall be the duty of the Proctor

to give information thereof to the civil magistrate, that the parties may be dealt

with according to law.

Offences cognisable by the laws of the land shall be left to the cognisance of the civil magistrate, if claimed by him, or otherwise to the judgment of the Faculty: all others to that of the Faculty. and such of these as are not specially designated in the enactments of the Visitors may be subjected by the Faculty to any of the minor punishments  permitted by these enactments.

Sentences of expulsion from the University (except in the case of challenge or combat with arms) shall not be final until approved by the board of Visitors or, when they are not in session, by a majority of them, separately consulted. but residence within the precincts, and attendance on the schools may be suspended in the mean time.

No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind,

— page 7 —

or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school, be covered without permission of the Professor, nor use tobacco by smoking or chewing, on pain of any of the minor punishments, at the discretion of

the Faculty, or of the board of

University of Virginia Board of Visitors

Minutes (October 4—5, 1824), Page 7

Censors, approved by the Faculty.

All damages done to

instruments, books, buildings, or other property of the University by any

student, shall be made good at his expence; and wilful injury to any tree, shrub,

or other plant, within the precincts, shall be punished by fine, not exceeding

ten dollars, at the discretion of the Faculty.

When a Professor knocks at the door of a student's room, any person being

within, and announces himself, it shall be opened, on pain of a minor

punishment; and the Professor may, if refused, have the door broken open; and

the expences of repair shall be levied on the Student, or Students within.

At the hour appointed for the meeting of every school, the roll of the school

shall be called over, the absentees, and those appearing tardily, shall be noted,

and if no sufficient cause be offered, at the rising of the school, to the

satisfaction of the Professor, the notation shall stand confirmed, and shall be

given in to the Faculty, the presiding  member of which for the time being

shall, on the 15th. days of May, August, and December, or as soon after each of

these days as may be, transmit by mail a list of these notations to the parent or

guardian of each delinquent.

When testimony is required from a Student, it shall be voluntary, and not

on oath. and the obligation to give it shall be left to his own sense of right.

Should the religious sects of this state, or any of them, according to the invitation held out to them, establish within, or adjacent to, the precincts of the University, schools for instruction in the religion of their sect, the students of the University will be free, and expected to attend religious worship at the establishment of their respective sects, in the morning, and in time to meet their school in the University at it's stated hour.

— page 8 —

The Students of such religious school, if they attend any school of the University, shall be considered as Students of the University, subject to the same regulations, and entitled to the same rights and privileges.

The room provided for a schoolroom in every Pavilion shall be used for the school of it's occupant Professor, and shall be furnished by the University with necessary benches and tables.

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 8

The upper circular room of the Rotunda shall be reserved for a Library.

One of it's larger elliptical rooms on it's middle floor shall be used for annual examinations, for lectures to such schools as are too numerous for their ordinary schoolrooms, and for religion worship, under the regulations allowed to be prescribed by law. the other rooms on the same floor may be used by schools of instruction in drawing,  music, or any other of the innocent and ornamental accomplishments of life; but under such instructors only as shall be approved and licensed by the Faculty.

The rooms in the Basement story of the Rotunda shall be, one of them for a Chemical laboratory; and the others for any necessary purpose to which they may be adapted.

The two open apartments, adjacent to the same story of the Rotunda, shall be appropriated to the Gymnastic exercises and games of the Students, among which shall be reckoned military exercises.

A military Instructor shall be provided at the expence of the University, to be appointed by the Faculty, who shall attend on every Saturday from half after one oclock, to half after three P.M. and shall instruct the Students in the Manual exercise, in field evolutions, maneuvres and encampments. the Students shall attend these exercises, and  shall be obedient to the military orders of their Instructor. the roll shall be regularly called over by him at the hour of meeting, absences and insubordinations shall be noted, and the list of the delinquents shall be delivered to the presiding member of the Faculty for

the time being, to be animadverted on by the Faculty, and such minor

punishments imposed as each case shall, in their discretion, require. the

school of Modern languages shall be pretermitted on the days of actual

military exercise.

— page 9 —

Substitutes in the form of arms

shall be provided by the Proctor, at

the expence of the University; they

shall be distinguished by

numbers, delivered out, received in

and deposited under the care and

responsibility of the Instructor, in a

proper depository to be furnished

him; and all injuries to them by a

student shall be repaired at the

expence of such Student.

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 9

Work-shops shall be provided, whenever convenient, at the expence of the

University, wherein the Students, who chuse, may exercise themselves in the

use of tools, and such mechanical practices as it is convenient and useful for

every person to understand, and occasionally to practice. these shops may be

let, rent-free, to such skilful and orderly Mechanics as shall be approved by the

Faculty, on the condition that they will permit the use of their tools, instruments and implements, within the shop, to such students as shall desire and use the permission discreetly, and under a liability for any injury they may do them; and on the further condition, if necessary, of such Mechanic's recieving instruction gratis in the mechanical and philosophical principles of his art, so far as taught in any of the schools.

The Board then proceeded to consider the draught of a Report to be made, as required by law, to the President and Directors of the Literary fund, and before concluding it finally they adjourned to tomorrow morning.

Tuesday October 5th 1824.

The board met pursuant to adjournment. present Thomas Jefferson, James Breckenridge, John H. Cocke, and Joseph C. Cabell.

On motion, Resolved that the Proctor be authorised and required. after the 15th. day of November next, to lease the Hotels of the University to such persons, offering, of worthy and proper character, as he shall approve; that the leases shall not be of a longer term than one year; and that he cause to be inserted therein such covenants as he shall deem necessary as to the preservation of the houses, inclosures, and appurtenances of the tenements, and observance of the preceding regulations

— page 10 —

and that this be published

without delay, that all persons may

have notice who may desire to apply.

And the Board, having

concluded, and agreed to the Report

to be made to the President and

Directors of the Literary fund,

adjourned without day

October 5th. 1824.

> University of Virginia Board of Visitors
> Minutes (October 4—5, 1824), Page 10

TH: JEFFERSON Rector.

Which Report is in the words

following.

To the President and Directors of the Literary fund.

In obedience to the law requiring that the Rector and Visitors of the

University of Virginia should make report annually to the President and

Directors of the Literary fund (to be laid before the legislature at their next

succeeding session) embracing a full account of the disbursements, the funds

on hand, and a general statement of the condition of the sd University, the sd

Rector and Visitors make the following REPORT.

— page 11 —

To the President and Directors of the Literary fund.

In obedience to the law requiring

that the Rector and Visitors of the

University of Virginia should make

report annually to the President and

Directors of the Literary fund (to be

laid before the legislature at their

next succeeding session) embracing

a full account of the

disbursements, the funds on hand,

and a general statement of the

condition of the sd University, the sd

Rector and Visitors make the following

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 11

REPORT.

In that of the preceding year it was stated that the buildings for the

accomodation of the Professors & Students were in readiness for their

occupation, and that the walls of the larger building, intended for a Library and

other purposes, were compleated. in the course of the present season this

building has received it's roof, and will be put into a condition for preservation

and use, although it's interior cannot be compleated. it was then also stated

that, without awaiting that completion, the institution might be put into

operation at the close of this present year were it's funds liberated from

the incumbrances with which they were charged. this obstacle was removed by the act of the legislature of January 27. of the present year concerning the University of Virginia.

In consequence of this liberation, the board of Visitors at their ensuing meeting, on the 5th. of April last, proceeded to take such preparatory measures as could be taken at that time to carry the views of the legislature into effect with as little delay as practicable. from the accounts and esti-

— page 12 —

mates then rendered by the Bursar and Proctor, it appeared that on the last day of the preceding year, 1823 the funds in hand and due to the University, of the last loan, and of the arrearages of subscriptions, would be sufficient, when recieved, to pay all debts then existing on any account, and to leave a sum of about 21,000.D. applicable to the building of the Library; which with the sum of

University of Virginia Board of Visitors Minutes (October 4—5, 1824), Page 12

19,370D.40½ already paid or provided for that edifice, would put it into a state of safety, and of some uses, until other and more pressing objects should have

been accomplished. they considered the University therefore as having had in hand, on the 1ˢᵗ. day of the present year 1824. the annuity of this year (clear of all prior claims) as a fund for defraying the current expences of the year, for meeting those necessary towards procuring Professors, paying any commencements of salaries which might be incurred to the end of the year, and to leave a small surplus for contingencies.

They found, from a view of the future income, consisting of the annuity, and such rents for buildings as may be reasonably required, that it would not be adequate to the full establishment of the 10. Professorships contemplated by the legislature in their act of Jan. 25. 1819. for establishing the University; but that it might suffice for instituting 8. professorships, for the present, and that the branches of science proposed to be taught in the University might be arranged within the competence of that number, for a time, and until future & favorable circumstances might enable them to add the others, and to lighten duly the professorships thus overcharged with duties.

They proceeded therefore to settle the organisation of the schools, and the distribution of the sciences among them, and they concluded on the same as follows.

— page 13 —

In the University of Virginia shall be instituted eight professorships, to wit, 1ˢᵗ. of Antient languages; 2ᵈˡʸ. Modern languages; 3. Mathematics; 4. Natural

philosophy; 5. Natural history; 6.

anatomy and Medecine; 7. Moral

Philosophy; 8. Law.

In the school of Antient

languages are to be taught the

higher grade of the Latin and Greek

languages, the Hebrew, rhetoric,

belles lettres, antient history &

antient geography.

> University of Virginia Board of Visitors
> Minutes (October 4—5, 1824), Page 13

In the school of Modern

languages are to be taught French,

Spanish, Italian, German, and the English language in it's Anglo-Saxon form;

also Modern history, & modern geography.

In the school of Mathematics are to be taught Mathematics

generally, including the higher branches of Numerical arithmetic, algebra,

trigonometry, plane and spherical, geometry, mensuration, navigation,

conic sections, fluxions or differentials, military and civil architecture.

In the school of Natural philosophy are to be taught the laws and properties

of bodies generally, including mechanics, statics, hydrostatics, hydraulics,

pneumatics, acoustics, optics, and astronomy.

In the school of Natural history are to be taught, botany,

zoology, mineralogy, chemistry, geology, and rural economy.

In the school of Anatomy and medecine are to be taught anatomy surgery,

the history of the progress and theories of medecine, physiology, pathology,

materia medica and pharmacy.

In the school of Moral philosophy are to be taught Mental

science generally, including ideology, general grammar, and ethics.

In the school of Law are to be taught the Common and Statute law, that of

the Chancery, the laws Feudal, civil, mercatorial, maritime and of Nature and

Nations; and also the principles of government & Political economy.

— page 14 —

But it was meant that this

distribution should give way to

occasional interchanges of particular

branches of science, among

the professors, in accomodation of

their respective qualifications.

The Visitors were sensible that

there might be found in the different

seminaries of the US. persons

qualified to conduct these several

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 14

schools with entire competence; but it was neither probable that they would leave the situations in which they then were, nor  honorable or moral to endeavor to seduce them from their stations: and to have filled the professional chairs with unemployed and secondary characters, would not have fulfilled the object, or satisfied the expectations of our country in this institution. it was moreover believed that, to advance in science, we must avail ourselves of the lights of countries already advanced before us. it was therefore deemed most advisable to resort to Europe for some of the professors, and of preference to the countries which speak the same language, in order to obtain characters of the first grade of science in their respective lines. and, to make the selection with proper information, caution and advisement, it was necessary to send an agent of science and confidence. Francis W. Gilmer, a learned and trustworthy citizen of this state, was appointed, and has proceeded on the mission; and  should his objects be accomplished as early as expected, we count on opening the institution on the 1st. day of February next.

   Could the donation of the last legislature, out of the debt due to this state from the US. have been obtained for the purposes of procuring a library and the apparatus necessary for the several schools the opportunity would have been highly advantageous of having them chosen by this agent, while in Europe, with the advice and assistance of the respective professors. but the application

was not in time to be acted on before the adjournment of the late Congress. yet

some books were

— page 15 —

indispensible, and some

apparatus to make even an

imperfect commencement, to

procure these articles therefore, & to

defray the expences necessary for the

other objects of the mission, the

board was  under the necessity of

applying to these purposes a sum of

10,500.D. of the annuity of the

present year, and to leave the

internal finishing of the Library,

University of Virginia Board of Visitors
Minutes (October 4—5, 1824), Page 15

however much to be regretted, until some opportunity of greater convenience

should occur.

There is some reason to doubt, from the information recieved whether our

agent will be able to effect his objects at as early a day as we had expected. but

of this more will be known in time for it's communication by the Rector with

this Report. were it still possible to obtain from the US. a settlement of so much

of the claim on them as was appropriated to this institution, in time to find our

agent and professors yet in place to invest it, our University would open under auspices highly propitious in comparison with those to which it will be subjected by this unfortunate delay.

The success of our Collector in his applications for the arrearages due from subscribers, has not been as great as it has been in further securing the sums which had not yet been secured. the reciepts from this resource, since the date of our last Report have amounted to 2069D.88½ C—and the sums deemed sperate and still to be recieved amount to 7468D.92½C

The accounts of the reciepts, disbursements, and funds on hand for the year ending with the last month of September, as rendered by the Bursar and Proctor, are given with this Report as is required by law.

TH: JEFFERSON Rector.

Oct. 5. 1824.

**RELATED CONTENT**

Categories:

*African American History* [https://encyclopediavirginia.org/category/african-american-history/]

*Antebellum Period (1820–1860)* [https://encyclopediavirginia.org/category/antebellum-period-1820-1860/]

*Colleges and Universities* [https://encyclopediavirginia.org/category/colleges-and-universities/]

*Slavery* [https://encyclopediavirginia.org/category/slavery/]

Type:

*Legal Document* [https://encyclopediavirginia.org/type/legal-document/]

*Unpublished* [https://encyclopediavirginia.org/type/unpublished/]

**MAP**

**TIMELINE**

## October 4—5, 1824

The University of Virginia board of visitors resolves that "no student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog."

**FURTHER READING**

## Central College Board of Visitors Minutes (October 7, 1817)

[https://encyclopediavirginia.org/entries/central-college-board-of-visitors-

minutes-october-7-1817/]

## University of Virginia Board of Visitors Minutes (July 4–7, 1840)

[https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-july-4-7-1840/]

## University of Virginia Board of Visitors Minutes (July 5–6, 1865)

[https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-july-5-6-1865/]

### CITE THIS ENTRY

**APA Citation:**

University of Virginia Board of Visitors. University of Virginia Board of Visitors Minutes (October 4–5, 1824). (2020, December 07). In *Encyclopedia Virginia*. https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824.

**MLA Citation:**

University of Virginia Board of Visitors. "University of Virginia Board of Visitors Minutes (October 4–5, 1824)" *Encyclopedia Virginia.* Virginia Humanities, (07 Dec. 2020). Web. 08 Mar. 2023



Kidnapped Americans | International Women's Day | California Weather | France Strike | CBS News Live | Managing Your Money | Essentials Shopping | Ne



Login

60 MINUTES - NEWSMAKERS

## What makes the AR-15 style rifle the weapon of choice for mass shooters?

BY SCOTT PELLEY
MAY 29, 2022 / 7:01 PM / CBS NEWS

The mass murder last week at Robb Elementary School in Uvalde, Texas, has something in common with America's ations of the AR-15 were used in this month's massacre at a da high school in 2018; a Texas church and a Las Vegas concert e AR-15 style weapon is the most popular rifle in America with ut, the AR-15 is the weapon of choice of the worst mass the speed of sound. And as we first showed you in 2018, we're high velocity ammo is the fear of every american emergency



### Be the first to know

Get browser notifications for breaking news, live
events, and exclusive reporting.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and
agree to the updated Terms.

Agree

Watch CBS News

Mass shootings were once so shocking they were impossible to forget. Now they've become so frequent its hard to remember them all. In October 2018, at a Pittsburgh synagogue, eleven were killed, six wounded.



Roses memorialize the people who died in the Sutherland Springs, Texas shooting

FBI Special Agent Robert Jones: This is the most horrific scene I've seen in 22 years with the Federal Bureau of Investigations. Members of the Tree of Life Synagogue conducting a peaceful service in their place of worship were brutally murdered by a gunman targeting them simply because of their faith.

Just 11 months before, it was a church in Sutherland Springs, Texas. Assistant fire chief Rusty Duncan was among the first to arrive.

Rusty Duncan: 90 percent of the people in there were unrecognizable. You know the blood everywhere, I mean it just covered them from head to toe. They were shot in so many different places that you just couldn't make out who they were.

The church is now a memorial to the 26 who were murdered.

Rusty Duncan: I've never had the experience, not with any kind of weapon like this. For me to see the damage that it did was unbelievable, it was shattering concrete. I, you know, you can only imagine what it does to a human body.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

rounds.

saw the holes in the church from one side to the other, all the

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News



A gunshot wound is potentially fatal no matter what kind of ammunition is used. But Cynthia Bir showed us the difference in an AR-15 round against gelatin targets in her ballistics lab at the University of Southern California.



Cynthia Bir with correspondent Scott Pelley

Cynthia Bir: Years of research have gone in to kind of what the makeup should be of this ordnance gelatin to really represent what damage you would see in your soft tissues.

Scott Pelley: So this is a pretty accurate representation of what would happen to a human being?

_____ e state of the art.

**_____ nises on them, they're going to be, parts of them**



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

_____ captured in slow motion. The handgun bullet traveled about 800
_____ gh the gel.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Cynthia Bir: see the difference?

Watch CBS News

Scott Pelley: Yes.

It's three times faster and struck with more than twice the force. The shockwave of the AR-15 bullet blasted a large cavity in the gel unlike the bullet from the handgun.

Scott Pelley: Wow. There's an enormous difference. You can see it right away.

Cynthia Bir: Yeah, exactly. There are fragments in here. There's, kind of took a curve and came out. You can see a much larger area in terms of the fractures that are inside.

Now watch from above. On top, the handgun, at bottom, the AR-15.

Scott Pelley: It's just exploded.

Cynthia Bir: It's exploded and it's tumbling. So what happens is, this particular round is designed to tumble and break apart.

The 9 mm handgun round has a larger bullet, but this AR-15 round has more gunpowder, accelerating its velocity. Both the round and the rifle were designed in the 1950's for the military. The result was the M16 for our troops and the AR-15 for civilians.

Cynthia Bir: There's going to be a lot more damage to the tissues, both bones, organs, whatever gets kind of even near this bullet path. The bones aren't going to just break, they're going to shatter. Organs aren't just going to tear or have bruises on them, they're going to be, parts of them are going to be destroyed.

That fairly describes the wounds suffered by 29-year-old Joann Ward. At Sutherland Springs Baptist Church she was shot more than 20 times while covering her children. Ward was dead, her daughters mortally wounded, as assistant fire chief Rusty Duncan made his way from the back of the sanctuary.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News

Rusty Duncan

Rusty Duncan: As I got a couple of rows up, Ryland's hand reached out from under his stepmom and grabbed my pant leg. I wouldn't even known he was alive until he did that. I didn't even see him under her. Well, that's where me and him made eye contact for the first time.

Joann Ward's five-year-old stepson Ryland Ward was hit five times and was nearly gone when he reached trauma surgeon Lillian Liao at San Antonio's University Hospital.

Scott Pelley: How much of Ryland's blood do you think was lost before he came to you?

Lillian Liao: At least half.

This is Ryland's ER X-ray.

Lillian Liao: You see the two bullet fragments that are in him.

Scott Pelley: The X-ray shows you the solid fragments of the shrapnel and the bullets, but it doesn't tell you much about the damage to the soft tissue.

Lillian Liao: No, and it doesn't tell you what's on the inside. I mean a bomb went off on the inside. And our job is to go in



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

the shockwave from these high-velocity rounds.

is, intestines, kidney, bladder and hip.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Scott Pelley: What do you mean?

Watch CBS News

Lillian Liao: Well his organs are now in different pieces and you have to reconstruct them. The arm was missing soft tissue, skin, muscle and part of the nerves were damaged. The bowel has to be put back together some of the areas of injury has to heal itself so you can see that he can walk around like a normal child and behave as normal as possible.

Lillian Liao

With the AR-15, it's not just the speed of the bullet, but also how quickly hundreds of bullets can be fired. The AR-15 is not a fully automatic machine gun. It fires only one round with each pull of the trigger. But in Las Vegas, it sounded like a machine gun.

A special add-on device called a bump stock allowed the killer to pull the trigger rapidly enough to kill 58 and wound 489. In other mass killings the AR-15 was fired without a bump stock, but even then, it can fire about 60 rounds a minute. Ammunition magazines that hold up to 100 rounds can be changed in about five seconds.

Maddy Wilford: I remember hearing the gunshots go off and being so nervous and scared and all of the sudden I felt something hit me.

Scott Pelley: You'd been shot how many times?



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

y ribs and lung.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News

Maddy Wilford

In February of 2018, 17-year-old Maddy Wilford was at school, Marjorie Stoneman Douglas High School in Parkland, Florida. 17 were murdered, 17 wounded.

Maddy Wilford: And I just remember thinking to myself, there's no way, like, not me, please, not me. I don't wanna go yet.

Laz Ojeda: Her vital signs were almost nonexistent. she looked like all the blood had gone out of her body. She was in a state of deep shock.

Paramedic Laz Ojeda saved Maddy Wilford, in part, because Broward County EMS recently equipped itself for the battlefield wounds that the AR-15 inflicts.

Laz Ojeda: We carry active-killer kits in our rescues.

Scott Pelley: Active-killer kits?

Laz Ojeda: Yes.

Scott Pelley: What is that?

compression needles, five hemostatic agents, five emergency



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

us today's wounds demand a new kind of training.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News

Peter Antevy: If I take you through one of our ambulances or take you through our protocols, almost everything we do is based on what the military has taught us. We never used to carry tourniquets. We never used to carry chest seals. These were things that were done in the military for many, many years.

Scott Pelley: When did all of that change?

Peter Antevy: It really changed I think after Sandy Hook.

After Sandy Hook Elementary School where 20 first graders and six educators were killed with AR-15 rounds, a campaign called "Stop the Bleed" began nationwide. Antevy and doctors including Lillian Liao in San Antonio, are training civilians who are truly the first responders. There have been more than 100,000 classes like this in the last seven years.

Peter Antevy: The day after the shooting, my kids, they're waking up, and they're "time to go to school." And, my son heard kind of heard what happened the night before, when I was on the scene, and he looked at me with the fear of God that he had to go to school that day. My first instinct was, "He needs a bleeding kit." My son today has a bleeding kit on his person.

Scott Pelley: How old is he?

[...]'ve given him this and I've taught him how to use it.

[...] have become so common –

[...]untry to be prepared.



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Scott Pelley: That's where we are in America today.

Watch CBS News

Peter Antevy: That's where we are.

Ryland Ward

Ryland Ward survived the church massacre because firefighter Rusty Duncan used his belt as a tourniquet.

For over a year Ryland has worked, often six days a week, learning to sit, stand, and walk again.

Ryland Ward: I'm going to see if this actually goes in the hospital. Yep.

Scott Pelley: Did you meet some new people in the hospital? You were there for a long time.

Ryland Ward: How do you know?

Scott Pelley: They told me. I talked to some of the people who helped you.

Ryland Ward: Like who?

Scott Pelley: There was, uh, Doctor –



**Be the first to know**

Get browser notifications for breaking news, live events, and exclusive reporting.

ling from the loss of his stepmother and sisters won't be as

uffer physical trauma, her interests have turned to medicine

Our Terms of Use ("Terms") have been updated, including changes to the arbitration clause. By clicking "Agree", you acknowledge that you have read and agree to the updated Terms.

Agree

Watch CBS News

Not long ago, many communities assumed mass murder would never come to them

Today, all Americans are being asked to prepare for the grievous wounds of high-velocity rounds.

*Produced by Ashley Velie. Associate producer, Dina Zingaro. Edited by Peter M. Berman.*

## Trending News

**The new world of AI chatbots like ChatGPT**

**SOLA: Daring to educate Afghanistan's girls**

**Stories from freed Ukrainian POWs about abuse and torture in Russian prisons**

**Investigating who betrayed Anne Frank and her family to the Nazis**

In:    **Sandy Hook Elementary School Shooting**    **Florida**    **AR-15 rifle**

**Scott Pelley**

Correspondent, "60 Minutes"

*First published on May 29, 2022 / 7:01 PM*

*© 2022 CBS Interactive Inc. All Rights Reserved.*

©CBS NEWS

Copyright ©2023 CBS Interactive Inc. All rights reserved.

Privacy Policy

Do Not Sell My Personal Information

Terms of Use

About

Advertise

Closed Captioning

CBS News Live on Paramount+

CBS News Store

Site Map

Contact Us

Help

Our **Terms of Use** ("Terms") have been updated, including changes to the arbitration clause. By clicking "**Agree**", you acknowledge that you have read and agree to the updated **Terms**.

**Agree**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

March 09, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-12314-HH
Case Style:  National Rifle Association, et al v. Commissioner, Florida Dept. of Law Enforcement
District Court Docket No:  4:18-cv-00137-MW-MAF

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs taxed against appellants</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

<u>Clerk's Office Phone Numbers</u>
General Information                              404-335-6100
New / Before Briefing Cases              404-335-6135
Cases in Briefing / After Opinion      404-335-6130
Cases Set for Oral Argument            404-335-6141
Capital Cases                                      404-335-6200
Attorney Admissions                           404-335-6122
CM/ECF Help Desk                            404-335-6125

OPIN-1A Issuance of Opinion With Costs